1

2

3

4

5

6

7

8

THE HONORABLE JOHN C. COUGHENOUR

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SCOTT AND KATHRYN KASEBURG, *et al*,

　　　　　　　　Plaintiffs,

　　　　v.

PORT OF SEATTLE, a municipal corporation; PUGET SOUND ENERGY, INC., a Washington for profit corporation; KING COUNTY, a home rule charter county; and CENTRAL PUGET SOUND REGIONAL TRANSIT AUTHORITY, a municipal corporation,

　　　　　　　　Defendants.

Case No. 14-cv-00784-JCC

DEFENDANT PORT OF SEATTLE'S OPPOSITION TO PLAINTIFFS' "MOTION FOR DECLARATORY JUDGMENT"

**ORAL ARGUMENT REQUESTED**

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii-v

I.      INTRODUCTION ............................................................................................................1

II.     FACTUAL BACKGROUND............................................................................................2

III.    STATEMENT OF ISSUE ...............................................................................................7

IV.     ARGUMENT ...................................................................................................................7

        A.      The Railbanking Statute by Its Terms Preserves the Railroad Easements While Also
                Allowing for Interim Use as a Trail...............................................................................7

        B.      The Takings Valuations Applied by the Court in *Haggart* and Other Takings Cases
                Either Explicitly Acknowledge or Implicitly Assume That the Original Railroad
                Easements Continue to Exist. ..................................................................................10

        C.      That Trail Use and Railbanking Are Not "Railroad Purposes" Has No Bearing on
                Whether the Railroad Easement Still Exists ...............................................................13

                1.      Whether railbanking is a "railroad purpose" is relevant only to whether there
                        was a taking ...................................................................................................13

                2.      "Change in use from railroad purposes" did not extinguish the
                        rail easement. .................................................................................................15

        D.      The Fact That Under Washington Law the Easement Would Have Been
                Extinguished but for the Railbanking Statute Is the Reason There Is a Taking. ......19

        E.      Even if Extinguished, the Rail Easement Was Replaced by a Broader and Equally
                Exclusive Easement. ...................................................................................................21

V.      CONCLUSION...............................................................................................................23

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - i

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

# TABLE OF AUTHORITIES

## Cases

*Adkins v. United States,*
    2012 U.S. Claims LEXIS 1975 (Fed. Cl. July 10, 2012) ....................................................16

*Anna F. Nordhus Family Trust v. United States,*
    98 Fed. Cl. 331 (2011) ....................................................................................................16

*Barclay v. United States,*
    443 F.3d 1368 (Fed. Cir. 2006) ....................................................................................17

*Biery v. United States,*
    99 Fed. Cl. 565 (2011) ....................................................................................................17

*Burgess v. United States,*
    109 Fed. Cl. 223 (2013) ..................................................................................................16

*Capreal, Inc. v. United States,*
    99 Fed. Cl. 133 (2011) ..........................................................................................7, 16, 22

*Chevy Chase Land Co. v. United States,*
    733 A.2d 1055 (Md. 1999) ..............................................................................................4

*Dana R. Hodges Trust v. United States,*
    101 Fed. Cl. 549 (2011) ..................................................................................................16

*Ellamae Phillips Co. v. United States,*
    564 F.3d 1367 (Fed. Cir. 2009) ................................................................................17, 18

*Ellamae Phillips Co. v. United States,*
    99 Fed. Cl. 483 (2011) ....................................................................................................16

*Farmers Coop. v. United States,*
    98 Fed. Cl. 797 (2011) ....................................................................................................16

*Friends of the E. Lake Sammamish Trail v. City of Sammamish,*
    361 F. Supp. 2d 1260 (W.D. Wash. 2005) ..........................................................7, 10, 21

*Geneva Rock Prods., Inc. v. United States,*
    107 Fed. Cl. 166 (2012) ............................................................................................14, 16

*Good v. Skagit County,*
    104 Wn. App. 670, 17 P.3d 1216 (2001) ......................................................................20

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - ii

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

*Gregory v. United States,*
    101 Fed. Cl. 203 (2011) ......................................................................................16

*Haggart v. United States,*
    108 Fed. Cl. 70 (2012) ...............................................................................*passim*

*Haggart v. United States,*
    116 Fed. Cl. 131 (2014) ........................................................................................6

*Hash v. United States,*
    403 F.3d 1308 (Fed. Cir. 2005) ....................................................................17, 18

*Illig v. United States,*
    58 Fed. Cl. 619 (2003)...........................................................................21, 22, 23

*Jenkins v. United States,*
    102 Fed. Cl. 598 (2011) ...............................................................................8, 12, 16

*Johnson v. Poway Unified Sch. Dist.,*
    658 F.3d 954 (9th Cir. 2011) ..............................................................................1

*Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA) Inc.,*
    560 F.3d 935 (9th Cir. 2009) ..............................................................................1

*Kershaw Sunnyside v. Interurban Lines,*
    156 Wn.2d 253, 126 P.3d 16 (2006).................................................................23

*King County v. Squire Inv. Co.,*
    59 Wn. App. 888, 801 P.2d 1022 (1990) ....................................................19, 20

*Ladd v. United States,*
    630 F.3d 105 (Fed. Cir. 2010) ...........................................................................17

*Lane v. Port of Seattle,*
    178 Wn. App. 110, 316 P.3d 1070 (2013).............................................................5

*Lawson v. State,*
    107 Wn.2d 444, 730 P.2d 1308 (1986)..........................................................19, 20

*Macy Elevator v. United States,*
    105 Fed. Cl. 195 (Fed. Cl. 2012) .......................................................................15

*McClurg Family Farm, LLC v. United States,*
    115 Fed. Cl. 1 (2014) ........................................................................................16

*Nat'l Wildlife Fed'n v. I.C.C.,*
    850 F.2d 694 (D.C. Cir. 1988)...........................................................................10

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

*Neitzel v. Spokane Int'l Ry. Co.,*
    80 Wash. 30, 141 P. 186 (1914) ................................................................23

*Northwest Supermarkets v. Crabtree,*
    54 Wn.2d 181, 338 P.2d 733 (1959) ........................................................22

*Palmetto Conservation Found. v. Smith,*
    642 F. Supp. 2d 518 (D.S.C. 2009) .........................................................22

*Preseault v. Interstate Commerce Comm'n,*
    494 U.S. 1, 110 S. Ct. 914, 108 L. Ed. 2d 1 (1990)...................................7

*Preseault v. City of Burlington,*
    908 A.2d 419 (Vt. 2006) ..........................................................................18

*Preseault v. United States,*
    100 F.3d 1525 (Fed. Cir. 1996) ..........................................................18, 20

*Raulerson v. United States,*
    99 Fed. Cl. 9 (2011) .................................................................................16

*Rhutasel v. United States,*
    105 Fed. Cl. 220 (2012) .......................................................................12, 16

*Rogers v. United States,*
    101 Fed. Cl. 287 (2011) ...........................................................................16

*State v. Preseault,*
    652 A.2d 1001 (Vt. 1994)..........................................................................18

*Thomas v. United States,*
    106 Fed. Cl. 467 (2012) ...........................................................................16

*Thompson v. United States,*
    101 Fed. Cl. 416 (2011) ...........................................................................16

*Toews v. United States,*
    376 F.3d 1371 (Fed. Cir. 2004) ...............................................................14

*Toscano v. United States,*
    107 Fed. Cl. 179 (2012) ...........................................................................16

*Washington Sec. & Inv. Corp., v. Horse Heaven Heights, Inc.,*
    132 Wn. App. 188, 130 P.3d 880 (2006).................................................23

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - iv

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

*Whispell Foreign Cars, Inc. v. United States,*
    100 Fed. Cl. 529 (2011) ................................................................................16

*Wild v. Brooks,*
    862 A.2d 225 (Vt. 2004) ..............................................................................18

*Ybanez v. United States,*
    98 Fed. Cl. 659 (2011) .................................................................................16

**Statutes and Regulations**

16 U.S.C. § 1247(d) .............................................................................1, 4, 7, 8, 19

49 U.S.C. § 10501 .........................................................................................14

49 C.F.R. 1152.29(c)(3) ...................................................................................10

49 C.F.R. 1152.29(d)(2) ...................................................................................10

**Other Authorities**

Rail Abandonments-Use of Rights-of-Way As Trails (49 CFR Parts 1105 & 1152),
    2 I.C.C.2d 591 (Apr. 16, 1986)........................................................................9

H.R. Rep. No. 98-28 (1983) ................................................................................8

*In re Ballard Terminal R.R. Co.,*
    STB Docket No. AB-6 (Sub-No. 465X), 2013 WL 3962853 (Aug. 1, 2013) ....................15

*In re Ballard Terminal R.R. Co.,*
    STB Finance Docket No. 35731, 2014 WL 7405869 (Dec. 30, 2014)...........................10

*In re BNSF Ry. Co.,*
    STB Finance Docket No. AB 6 (Sub. No. 464X), 2008 WL 4718449 (Oct. 27, 2008)......10

*In re King County,*
    STB Finance Docket No. 35148, 2009 WL 2979430 (Sept. 18, 2009) ...........................10

Lewis Simes & Hon. John Borron Jr.,
    *Simes and Smith The Law of Future Interests* (3rd ed. 2002) .................................9

Webster's Third New Int'l Dictionary (2002) ...............................................................11

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - v

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

# I. INTRODUCTION

Plaintiffs' motion for Declaratory Judgment[1] would turn the federal railbanking statute, 16 U.S.C. § 1247(d), on its head. The statute's stated purpose is to "preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use." Plaintiffs' motion asks the Court to declare that the statute had the opposite effect of eliminating the railroad right-of-way.[2]

Plaintiffs reach this flawed conclusion by misinterpreting language from decisions on a related but different issue. In takings cases, courts have found that the trail use and railbanking that the statute authorizes are not "railroad purposes" and exceed the scope of the railroad easements and, *but for* the statute's application, abandonment of the easement would have occurred. The courts have held that the railbanking statute allowed this expanded use and prevented the reversion of the existing rights of way to abutting landowners, thus entitling the landowners to compensation for a "taking." Plaintiffs argue that this means the railroad easements are extinguished but the cases hold nothing of the sort. Most of these decisions do not even address the issue presented here, which is defining the property rights that exist <u>after</u> the taking. In those that do, the courts hold that the statute <u>preserved</u> the rail easement while also allowing trail use.

---

[1] Plaintiffs inaccurately refer to their motion as a "Motion for Declaratory Judgment," but there is no such motion cognizable in federal court: "[A] party may not make a motion for declaratory relief, but rather, the party must bring an action for a declaratory judgment . . . The only way plaintiffs' motion can be construed as being consistent with the Federal Rules is to construe it as a motion for summary judgment on an action for a declaratory judgment." *Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 943 (9th Cir. 2009) (citation omitted). As a summary judgment motion, the court must view the facts and inferences in the light most favorable to the nonmoving party, the defendants. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011).

[2] The Port's brief is limited to this issue as the Port understands King County will address the deed issues. (Plaintiffs are incorrect in alleging that the Port was substantively involved with "title work" for the corridor.) Plaintiffs have offered no evidence, however, to support their factual assertions that BNSF's property rights were easements limited to railroad purposes. Documents attached to a motion for which no testimony or affidavits are provided are not evidence. While plaintiffs <u>may</u> be able to present some of the cited and attached documents in an admissible form, they have made no attempt to do so. *See, e.g.*, Dkt. 55 at 11 n.5 (discussion purporting to establish intent based on a book written in 1891). In addition, plaintiffs assert many of the "facts" for the first time in this motion despite failing to disclose them in their initial disclosures and responses to discovery requests. Thomsen Decl. Exs. 17-18.

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 1

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

Plaintiffs' argument also ignores the decision in *Haggart v. United States*, 108 Fed. Cl. 70 (2012), the takings case involving this rail corridor and almost all of the plaintiffs in the present case. There, the Court of Federal Claims acknowledged that the railbanking statute "preserves railroad-purpose easements" and implicitly found that the rail easement continued to exist, stating that the property right "after" the taking included the right to use the corridor for commuter rail and reactivation of freight rail. These holdings are contrary to plaintiffs' current position that only a "trail easement" exists and that the rail easement is extinguished. Plaintiffs' contention that the railbanking statute somehow suspends the rail easement pending "reactivation" has no basis in law or logic and would make use of the corridor for commuter rail impossible unless coupled with freight use, contrary to the valuation performed in *Haggart*, plaintiffs' own takings case.

Plaintiffs' position also would defeat the very purpose for which Congress created the railbanking statute, namely "that every [railroad] line is a potentially valuable national asset that merits preservation even if no future rail use for it is currently foreseeable." Accepting plaintiffs' argument would require this Court to conclude that a statute enacted for the purpose of protecting existing rail easements instead extinguished those easements as a matter of federal law.

## II. FACTUAL BACKGROUND

**BNSF's Divestiture of the Corridor.** The BNSF Railway Company ("BNSF") was the original owner of and common carrier over a 42-mile railroad corridor in east King and Snohomish counties, commonly referred to as the Eastside Rail Corridor ("the corridor"). In 2003, BNSF decided to sell the corridor and provided the opportunity to the Puget Sound region to maintain and preserve the corridor for transportation purposes. Thomsen Decl. Ex. 1 (PSRC study) at 1.

**The Region Agrees to Acquire the Corridor for Transportation Purposes.** In response, eight governmental jurisdictions along the corridor[3] engaged in a multi-year public process to

---

[3] These jurisdictions were King County, Snohomish County, and the Cities of Bellevue, Kirkland, Redmond, Renton, Snohomish, and Woodinville. The Port of Seattle, Sound Transit, and the Washington State Department of Transportation also participated in the process.

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 2

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1    evaluate the future of the corridor and its potential acquisition. *See id.* That process, overseen by

2    the Puget Sound Regional Council ("PSRC"), ended with those jurisdictions "unanimously

3    agree[ing] that this regional rail corridor should be preserved for any number of transportation

4    uses." *Id.* at 9. Significantly, the PSRC study acknowledged that, while portions of the corridor

5    could be railbanked and made available for interim trail use under the federal railbanking statute,

6    trail use was a secondary priority to future transportation purposes. *Id.* at 7, 63. As the PSRC

7    noted: "If a trail is developed in the corridor in the short-term, it is important to preserve this

8    future rail potential by . . . clearly communicat[ing] that the trail is an initial public use and that the

9    corridor will be undergoing reconsideration for passenger rail in the future." *Id.* at 63.

10          Subsequently, King County and the Port of Seattle entered into a "Memorandum of

11   Understanding" where they outlined the framework for purchasing the corridor and maintaining it

12   for transportation purposes. Thomsen Decl. Ex. 2. In their Memorandum, the parties recognized

13   that a critical element of the competitiveness of the Port and King County was the "velocity and

14   capacity of facilities and infrastructure for the transfer of international cargo" and that the Port, in

15   particular, had a strong desire "to acquire and preserve [the corridor] as a rail and transportation

16   corridor." *Id.* at 1. To offset the significant cost to purchase the corridor, several local government

17   agencies and public utilities, including King County, the City of Redmond, Puget Sound Energy,

18   and Sound Transit, agreed "to share in the cost of acquiring" the corridor in light of the regional

19   benefits the corridor provided. Thomsen Decl. Ex. 3 at 1. The regional partners recognized the

20   importance of acquiring the corridor to preserve current and future transportation uses, specifically

21   providing that the corridor should be available for light rail and other public transportation

22   purposes once acquired. Thomsen Decl. Ex. 3 at 1, 2.

23          **The Railbanking of the Corridor.** BNSF, the Port of Seattle, and King County entered

24   into a series of interrelated agreements that transferred the corridor to the Port, while preserving

25   the underlying right of way for existing and future transportation purposes. Thomsen Decl. Ex. 4.

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 3

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1        As required by those agreements, in September 2008, BNSF filed a Petition for Exemption

2   with the Surface Transportation Board ("STB") to allow for the railbanking of the corridor.

3   Thomsen Decl. Ex. 5.  In its petition, BNSF explained that it was coordinating its petition for

4   exemption as part of a "multi-transaction arrangement" whereby the Port would "purchase the Line

5   from BNSF with track and structures intact" and the County would "railbank the Line under 16

6   U.S.C. § 1247(d)," allowing the parties to "determine the Line's ultimate use following receipt of

7   input from the public after the line is railbanked." *Id.* at 4.  BNSF stated that it sought this

8   exemption "so the Port and County can execute their plans for the Line." *Id.*

9        Contemporaneously, King County filed a statement expressing its willingness to assume

10  financial responsibility over the corridor and requesting issuance of a Notice of Interim Trail Use

11  ("NITU").  Thomsen Decl. Ex. 6.  Thus, although BNSF filed a petition for exemption to authorize

12  abandonment, the purpose of that petition was to facilitate the railbanking and transfer of the

13  corridor to the Port and King County.[4]

14       On October 27, 2008, the STB issued a NITU based on the County's and BNSF's

15  expressed willingness to "negotiate for trail use." Thomsen Decl. Ex. 7 at 2.  The STB noted that

16  if the parties successfully negotiated an agreement, no further STB action was necessary, although

17

18  [4] This Court previously suggested that BNSF "abandoned" the right-of-way "effectively" or "in an everyday sense of

19  the word." Order at 2, 4 (Dkt. 59) (Dec. 5, 2014).  But BNSF petitioned the STB to facilitate the transfer of BNSF's
    common carrier obligations, while still maintaining the line as a rail corridor, all as required by the agreements with

20  the Port and King County.  Because the law required BNSF to file its petition to abandon, it does not equate to
    "abandoning" the right-of-way under state law:

21      [To] accept [that] the railroad's acts taken in pursuit of federal regulatory approval for "abandonment" as . .
        . demonstrat[ing] an intent to abandon an easement under state law, it would create an irreconcilable

22      dilemma for railroads wishing to pursue rails-to-trails agreements or otherwise dispose of their property
        interests in right-of-ways.  The railroad could not pursue a rails-to-trails agreement without filing an

23      application for regulatory abandonment at the ICC, but the actions taken to pursue such an application, and
        the application itself, would constitute evidence of abandonment for state law purposes, thereby causing it
        to risk undermining the rails-to-trails agreement.  This would create a Hobson's choice for the railroad that

24      must apply for regulatory abandonment under federal law as the necessary first step to obtaining a CITU,
        while that application itself would constitute evidence of an intent to abandon in terms of state law (thereby

25      undermining the CITU effort by making it more costly).  Such a holding would completely frustrate state
        and federal policies intended to promote the preservation of rail corridors and their conversion to trail use.

  *Chevy Chase Land Co. v. United States*, 733 A.2d 1055, 1090-91 (Md. 1999).

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 4

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700  FAX. (206) 623-8717

1    the "[u]se of the right-of-way for trail purposes [was] subject to restoration for railroad purposes."

2    *Id.* Alternatively, the STB noted that if "no agreement is reached . . . BNSF may fully abandon the

3    line." *Id.* at 3.

4          The parties successfully negotiated an agreement that provided for interim trail use, while

5    at the same time allowing for the transfer of BNSF's interests in the corridor to the Port. Thomsen

6    Decl. Ex. 8. As a result, the condition for abandonment never occurred.

7          **The Port's Intent to Preserve the Corridor for Railroad Purposes.** In December 2009,

8    and as a result of the successful railbanking of a portion of the corridor, the Port paid BNSF $81

9    million for the northern portion of the corridor. Thomsen Decl. Ex. 4. BNSF donated the balance

10   of the corridor. *Id.* These were a "a single, interdependent transaction." *Lane v. Port of Seattle*,

11   178 Wn. App. 110, 115, 316 P.3d 1070 (2013).

12         The Port's expressed purpose for purchasing the corridor was to "preserve[] a valuable

13   transportation asset for the region, maintain[] current freight rail service, and secure[] the corridor

14   for potential future freight rail use supporting the region's economy." Thomsen Decl. Ex. 9. The

15   Port carefully considered and determined that "the purchase was reasonably necessary to link rail

16   services within the port district to the interstate line." *Lane,* 178 Wn. App. at 125. The Port

17   concluded "that if it did not step up to acquire the Eastside Rail Corridor, [BNSF] would have

18   parceled it out to various owners, eliminating the possibility of preserving the corridor for future

19   rail service and transportation needs and thereby depriving the Puget Sound economy of a

20   competitive advantage." *Id.* at 126. An intent of the Port was to keep the corridor intact to move

21   freight immediately "in the event . . . a natural disaster" disabled the main freight line along Puget

22   Sound. *Id.*

23         As contemplated at the time of purchase, the Port sold certain rights and portions of the

24   corridor to other entities including Sound Transit and Puget Sound Energy. Thomsen Decl. Exs.

25   11-15. Each transaction expressly preserved the ability to use the corridor for freight and other

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 5

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1    transportation uses and recognized that the corridor could be immediately reactivated for freight

2    rail purposes. *Id.*

3        **Existing Easements Throughout the Corridor.** At the time of the Port's acquisition,

4    easements existed throughout the entire corridor for a variety of uses, including those granted by

5    BNSF to private and governmental entities for underground and surface pipelines for gas, water,

6    sewage, and drainage; underground and overhead electrical, telephone, cable, power, and fiber

7    optic wires; and roads and highways, including Interstate 405. Thomsen Decl. Ex. 10.

8        **The *Haggart* Case.** In February 2009, a group of plaintiffs, including virtually all of the

9    plaintiffs in this case,[5] sued the United States in the Court of Federal Claims for a "taking" as a

10   result of the STB's issuance of the NITU for the Eastside Rail Corridor. *Haggart v. United States*,

11   No. 09-103L (Fed. Cl.). None of the defendants in this action were parties to that lawsuit or were

12   asked to participate in any way by plaintiffs during the proceedings, despite plaintiffs' awareness

13   of their interests in the corridor.

14       Following cross-motions for summary judgment, the *Haggart* court held that the STB's

15   issuance of the NITU for the corridor constituted a taking that required the United States to

16   compensate the property owners for their property. 108 Fed. Cl. 70 (2012). The court held that

17   the government owed the plaintiffs the difference between the value of their land unencumbered

18   by the railroad easement (what they would have had the railbanking statute not prevented

19   abandonment under state law) and the value of their land encumbered by a "general easement

20   permitting recreational trail use with the potential for future railway use by way of rail-banking or

21   possible future development of a commuter rail line." *Id.* at 96.[6]

22       The United States and the plaintiffs later entered into a settlement agreement approved by

23   the court. *Haggart v. United States*, 116 Fed. Cl. 131 (2014). Under the terms of that settlement

24   ──────────────

25   [5] The Port understands that only ten plaintiffs in this case own properties not involved in *Haggart*.

[6] Plaintiffs in this case refused to produce in response to discovery the final appraisals used for valuing the taking to allow the Port to evaluate what "taking" they were compensated for in *Haggart*. Thomsen Decl. Ex. 17.

agreement, plaintiffs in the *Haggart* decision will collectively receive $137,961,218.69, equating

to an average of $545,000 per plaintiff. *Id.*

## III. STATEMENT OF ISSUE

Should this Court deny plaintiffs' request for a "declaration" that operation of the federal

railbanking statute extinguished the railroad easements, because it is inconsistent with the statute's

purpose and language and the measure of damages and findings in the *Haggart* case?

## IV. ARGUMENT

**A.    The Railbanking Statute by Its Terms Preserves the Railroad Easements While Also Allowing for Interim Use as a Trail.**

Plaintiffs seek a declaration that by application of the federal railbanking statute (16 U.S.C.

1247(d)), the "easement for railroad purposes has been extinguished" and replaced with a trail

easement. The railbanking statute expressly has the opposite effect and preserves railroad rights-

of-way.

Congress adopted the railbanking statute "in furtherance of the national policy to <u>preserve</u>

<u>established railroad rights-of-way for</u> future reactivation of rail service, to protect rail

transportation corridors, and to encourage energy efficient transportation use." 16 U.S.C. 1247(d)

(emphasis added). As the Court of Federal Claims noted: "Through passage of the National Trails

System Act Amendments of 1983 (the Trails Act), Congress authorized a process by which the

railroad's right-of-way can be preserved for future railroad use, and during the interim period, used

as a recreational trail." *Capreal, Inc. v. United States*, 99 Fed. Cl. 133, 136 (Fed. Cl. 2011); *see

also Friends of the E. Lake Sammamish Trail v. City of Sammamish*, 361 F. Supp. 2d 1260, 1274

(W.D. Wash. 2005) ("The purpose of the [statute] is not to encourage the development of

recreational trails . . . it is to encourage the transition of these railbeds into recreational trails, and

to preserve the right-of-way for possible future railroad reactivation."); *Preseault v. Interstate

Commerce Comm'n*, 494 U.S. 1, 19, 110 S. Ct. 914, 108 L. Ed. 2d 1 (1990) (*Preseault I*) (statute

enacted because Congress determined "that every [railroad] line is a potentially valuable national

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 7

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1 asset that merits preservation even if no future rail use for it is currently foreseeable").

2   Plaintiffs' contention that the rail easement has been "converted" into a trail easement is

3 not based on the statute. The statute's authorization to use the right-of-way as a trail does not

4 convert any existing property right; it merely prevents the abandonment of that right – the opposite

5 of plaintiffs' contention. The statute notes that the interim use of "railroad rights-of-way" as a trail

6 "shall <u>not</u> be treated . . . as an abandonment of the use of such rights-of-way for railroad purposes."

7 16 U.S.C. 1247(d) (emphasis added). Thus, while the statute may allow for trail use in the railroad

8 right-of-way, and what some courts have imprecisely called a "trail easement," it nonetheless

9 preserves the existing rail easement:

10   in the case of interim use of any established railroad rights-of-way . . . in a manner
    consistent with the National Trails System Act, if such interim use is subject to
11   restoration or reconstruction for railroad purposes <u>such interim use shall not be treated</u>,
    for purposes of any law or rule of law, <u>as an abandonment of the use of such rights-of-</u>
12   <u>way for railroad purposes.</u>

13 16 USC § 1247(d) (emphasis added).[7] It is basic property law and common sense that if the

14 existing rail easement is not abandoned, it remains in effect.

15   The Act's legislative history confirms that its purpose was to preserve the railroad

16 easements while simultaneously allowing for interim use as a trail:

17   The key finding of this amendment is that interim use of a railroad right-of-way for trail
    use, <u>when the route itself remains intact for future railroad purposes</u>, shall not constitute
18   an abandonment of such rights-of-way for railroad purposes. . . .

19

   This provision <u>will protect railroad interests by providing that the right-of-way can be</u>
20   <u>maintained for future railroad use</u> even though service is discontinued and tracks
    removed, and by protecting the railroad interests from any liability or responsibility in the
21   interim period.

22 H.R. Rep. No. 98-28, at 8-9, (1983); *see also Jenkins v. United States*, 102 Fed. Cl. 598, 614

23 ─────────────────────

[7] Plaintiffs may argue that the railbanking statute only preserves "rights of way" and not "easement rights." They are
24 the same thing, as demonstrated by plaintiffs' own argument that the source conveyances are "rail easements" based
  on inclusion of the term "rights-of-way." Congress's use of the term "right of way" preserved the rail easements. It
25 would strain credibility to argue that the railroad's right to the property was merely an easement because the deed
  language used the term "right-of-way" and yet argue that Congress's use of the same term did not preserve that same
  property right.

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 8

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623 8717

1   (2011) (citing statute's history in noting the statutory purpose of "facilitate[ing] the preservation of

2   rail corridors"). An oft-cited treatise summarized the legislation:

3       In 1983, Congress amended the National Trails System Act (Trails Act) to solve the
        problem caused by state property law that allowed railroad easements to lapse upon
4       abandonment of rail service. To avoid having easements lapse, the amendment directs
        several federal agencies to encourage state or local agencies or private organizations to
5       develop inactive rail corridors for recreational use, subject to future restoration of rail
        services.
6

7   Lewis Simes & Hon. John Borron Jr., *Simes and Smith The Law of Future Interests* § 290 (3rd ed.

8   2002). The Supreme Court affirmed this purpose in *Preseault I*, holding that blocking

9   abandonment "prevented property interests from reverting under state law." 494 U.S. at 8.

10      The STB, the only entity with the power to authorize the abandonment of rail lines and

11  permit trail use on railroad rights of way, has commented on the Act's "key finding," noting:

12      This language demonstrates that the main purpose of the amendment is to remove
        reversion as an obstacle that hinders or prevents the successful conversion of entire linear
13      rights-of-way to recreational use when the rights-of-way have been operated under
        easements for railroad purposes. Thus, Congress intends that trail use occur and rights-
14      of-way remain intact when they otherwise would be subject to reversionary interests.

15  Rail Abandonments-Use of Rights-of-Way As Trails (49 CFR Parts 1105 & 1152), 2 I.C.C.2d 591,

16  597 (Apr. 16, 1986) (emphasis added). When rulemaking under the 1983 amendments, the STB

17  stated that trail use does not change or eliminate the rail easements: "[W]e conclude that the

18  amendment must be construed as follows: . . . (d) Section 1247(d) preempts State laws that would

19  otherwise result in extinguishment of easements for railroad purposes and reversion of rights-of-

20  way to abutting landowners." *Id.* at 596. The STB continued:

21      This language, and its legislative history, express congressional intent to preempt State
        property law that might otherwise require a reversion of rights-of-way upon the
22      discontinuance of rail operations . . . . Since the amendment provides that interim trail use
        under section 1247(d) shall not constitute abandonment of rights-of-way for railroad
23      purposes, the railroad easement continues and reversionary interests do not mature.

24  *Id.* at 600. As the STB has noted in a prior ruling related to this same corridor, "a rail banked line

25  is not abandoned, but remains part of the national rail system, albeit temporarily unused for

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 9

1    railroad operations." *In re King County*, STB Finance Docket No. 35148 (Sept. 18, 2009); *see also*

2    *Friends of the E. Lake Sammamish Trail*, 361 F. Supp. 2d at 1273-74 ("railbanked corridors

3    remain part of the national rail transportation system").[8]

4        For this corridor (as all others), the STB issued the NITU based on the trail sponsor's (here,

5    King County) agreement that "the use of the right-of-way for trail purposes is subject to future

6    reactivation for rail service," an agreement required by 49 C.F.R. 1152.29(d)(2). *In re BNSF Ry.*

7    *Co.*, STB Docket No. AB-6 (Sub-No. 464X), 2008 WL 4718449, at *2 (Oct. 27, 2008). Upon

8    authorization or exemption "to construct and operate a rail line over the right-of-way," the STB

9    must vacate the NITU. 49 C.F.R. 1152.29(c)(3). The STB's ability to rescind its NITU and

10    immediately authorize railroad use indicates that the NITU process – including the process

11    followed for this particular corridor – does not "extinguish" the right to use the corridor under the

12    original railroad easement. *See also In re Ballard Terminal R.R. Co.,* STB Finance Docket No.

13    35731, 2014 WL 7405859, at *4 (Dec. 30, 2014) (stating that this corridor will be reactivated for

14    rail use upon request of a petitioner who has "sufficient financing and demonstrates sufficient

15    shipper demand to warrant the proposed reactivation"). No right to "reactivation" could occur

16    unless the rail easement continues to exist.

17    **B.**    **The Takings Valuations Applied by the Court in *Haggart* and Other Takings Cases**
**Either Explicitly Acknowledge or Implicitly Assume That the Original Railroad**

18        **Easements Continue to Exist.**

19        Plaintiffs' argument that trail use extinguished the railroad easement ignores *Haggart v.*

20    *United States*, 108 Fed. Cl. 70 (2012), these plaintiffs' own takings case. In *Haggart,* the court

21    found that, for purposes of valuing the taking, the "before" value was unencumbered property

22    because railbanking blocked plaintiffs' reversionary interest. In other words, but for the statute,

23

24    [8] In reviewing the agency's rulemaking under the statute, the D.C. Circuit noted that extinguishment of the rail easement may not occur until after the agency issues a certificate of abandonment. *Nat'l Wildlife Fed'n v. I.C.C.*, 850 F.2d 694, 704 (D.C.

25    Cir. 1988) ("Nor may state law cause a reverter of a right-of-way prior to an ICC-approved abandonment. Instead, it is only after an unconditional certificate has been issued that a right-of-way may be transferred or extinguished under state law."). A holding that the rail easement extinguished <u>despite</u> no STB-approved abandonment would directly conflict with this authority.

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 10

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1   the temporary discontinuance of rail use would be an abandonment and the property rights would

2   have reverted to plaintiffs. *See Haggart*, 108 Fed. Cl. at 97-98. The "after" condition of the

3   plaintiffs' property was "uncontested": "property burdened by a general easement permitting

4   recreational trail use with the potential for future railway use by way of rail-banking or possible

5   future development of a commuter rail line." *Id.* at 96. The court in *Haggart* recognized that the

6   contemplated rail use was not speculative and the rail easement was not, as plaintiffs insist here, a

7   novel property interest involving a future easement triggered by STB "reactivation." *See* Motion

8   at 18.[9],[10]

9       The court in *Haggart* noted not only the potential for reactivation for freight rail use, but

10  also the planned development for commuter rail use. *Haggart*, 108 Fed. Cl. at 96. The court's

11  understanding of the continued existence of the railroad easement is plain in its ruling: "The NITU

12  mechanism, even as it preserves the continued existence of the easement, points to the

13  government's liability for transforming the purpose of the easement beyond what the original

14  parties to the transaction contemplated." *Haggart*, 108 Fed. Cl. at 82 (emphasis added); *see also*

15  *id.* at 76 n.3 ("Rail-banking under the Trails Act preserves railroad-purpose easements which

16  otherwise would terminate by operation of law, thus retaining the easements for potential later

17  reactivation of railroad use.") (emphasis added).

18      Notably, the court in *Haggart* did not limit the rail easement to freight, as plaintiffs imply

19  by arguing that the easement exists only if the STB reactivates the line for freight. Instead, the

20

21  [9] The purpose of the statute was to preserve railroad corridors despite the fact that there was no current freight rail use
    of the corridor. In *Preseault I*, the plaintiff landowners claimed that railbanking was a sham given that "trail

22  conversion is permitted only after the Commission determines that rail service will not be needed in the foreseeable
    future." 494 U.S. at 18. Rejecting that argument, the court held, "That the ICC must certify that public convenience

23  and necessity permit abandonment before granting a CITU or NITU does not indicate that the statute fails to promote
    its purpose of preserving rail corridors. . . . Congress apparently believed that every line is a potentially valuable
    national asset that merits preservation even if no future rail use for it is currently foreseeable." *Id.* at 19.

24
    [10] Plaintiffs' construction (that the easement is a future contingent interest) might make sense if the propositional

25  phrase in the statute's purpose clause were "upon future reactivation" rather than "for future reactivation." "For"
    means "in order to bring about . . . with the purpose or object," while "upon" means "on the condition of." Webster's
    Third New Int'l Dictionary 886, 2518 (2002).

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 11

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1    court valued the "after" condition of the property as encumbered with a "general easement" for

2    "recreational trail use with the potential for future railway use by way of rail-banking or possible

3    future development of a commuter rail line." *Id.* at 96 (emphasis added). The United States

4    compensated these plaintiffs not just for the expanded use as a trail but also for the preservation of

5    the rail easement that would have reverted to plaintiffs but for the statute.

6           Courts addressing takings valuations in other recent cases have acknowledged the

7    continued existence of the rail easement. In *Jenkins v. United States*, 102 Fed. Cl. 598 (2011), the

8    court explained the two elements of the taking. One element was what the court described as the

9    "railbanking taking." The court said it was using that term for clarity only, and not to distinguish

10   the interest from the railroad purposes easement:

11          At oral argument, the government preferred to use the term "railroad purpose easement"
            rather than "railbanking easement" to refer to the scope or extent of its taking as limited
12          to the taking of an easement subject to possible reactivation as a railroad. However, to
            avoid confusion with the court's analysis of the scope of the deeded easements—in which
13          the court refers to the scope as limited to railroad purposes only—the court will use the
            term "railbanking easement" rather than "railroad purpose easement" for Part IV of its
14          analysis, in line with the terminology found in the regulations accompanying the Trails
            Act.
15

16   *Id.* at 603 n.8 (emphasis added). The court further explained:

17          the government's taking liability [arises from the] NITU which blocked the ability of the
            underlying fee owners to reclaim their property free of any railroad easement. Where, as
18          here, a trail use agreement has been consummated, the scope or extent of the
            government's taking liability is not limited to railbanking only, but extends to all of the
19          uses authorized by the NITU, including the recreational trail.

20   *Id.* at 619 (emphasis added). The *Jenkins* court thus recognized the continued existence of the

21   railroad easement but "to avoid confusion" sometimes referred to it as the "railbanking easement."

22   *See also Rhutasel v. United States*, 105 Fed. Cl. 220, 430 (2012) (holding that the claim that "the

23   Government is only liable for the taking of an easement for railroad purposes is erroneous" and

24   that the government was also liable for trail use of the easement) (emphasis added).

25          These recent takings cases, in which the courts analyzed the scope of the parties' property

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 12

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1   rights "after" the takings, acknowledge the continued existence of the rail easement after issuance

2   of the NITUs.  Each of these cases found that the railbanking statute preserved the railroad

3   easement, entitling property owners to compensation based in part on its continued existence.  In

4   none of these cases did the court convert the railroad easement to some inchoate future contingent

5   interest.  Contrary to plaintiffs' arguments, continued existence of the railroad purposes easement

6   does not mean no taking occurred but precisely the opposite; one element of the taking was the

7   preservation of the rail easement that otherwise would have been extinguished (i.e., the "blocked"

8   reversionary interest).

9        The progenitor of all railbanking takings cases, *Preseault I,* says this.  In *Preseault I*, the

10  Supreme Court stated that the railbanking statute "prevented property interests from reverting

11  under state law."  494 U.S. at 8 (emphasis added).  The Court did not view the statute as creating a

12  new type of property interest, such as a rail easement that "springs" to life upon reactivation by the

13  STB, as plaintiffs contend.  The Court stated what is self-evident from the statute's language:  the

14  statute prevents reversion of the rail easement that would otherwise have occurred when the

15  easement is no longer used for a rail line and instead for a trail.

16  **C.    That Trail Use and Railbanking Are Not "Railroad Purposes" Has No Bearing on**
        **Whether the Railroad Easement Still Exists.**
17

18          **1.     Whether railbanking is a "railroad purpose" is relevant only to whether there**
               **was a taking.**

19       Plaintiffs mistakenly argue that the Port claims that railbanking is "a railroad purpose."

20  Whether railbanking and interim trail use are railroad purposes is relevant only to whether each

21  exceeds the scope of the railroad easement and a taking occurs; it has no relevance to whether the

22  railroad easement still exists after railbanking.

23       The court's reasoning in *Haggart* illustrates the distinction between the two issues. There,

24  as in other takings cases, the United States argued that the use of the corridor as a trail was not a

25  taking because Congress intended that trail use preserve the rail easement, thus serving a railroad

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 13

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1    purpose and falling within the scope of the original easement. *Haggart,* 108 Fed. Cl. at 81. The

2    court rejected the government's argument because it found the trail use exceeded the scope of the

3    railroad easement. Its reasoning, however, clearly distinguished between the taking (loss of

4    plaintiffs' reversionary interest due to the railbanking statute and the expanded use of the rail line

5    as a trail) and continued existence of the easement for railroad purposes:

> [T]he existence of rail-banking and other potential future rail-related uses do not insulate
> the government from a takings claim. Abandonment of the easement is not at issue here;
> in fact, the court need not determine when, or even whether, the line was abandoned to
> find that the government has committed a taking. What is important to the court's
> analysis, rather, is whether the NITU authorized use of an easement exceeding one for
> railroad purposes.

10   *Id.* As the decision in *Haggart* illustrates, it is the effect of the NITU blocking the reversion and

11   adding trail use that constitutes the taking.

12        The *Haggart* court concluded this analysis (rejecting the argument that trail use/railbanking

13   are railroad purposes) by stating that the railroad easement continued to exist after the creation of a

14   trail easement: "The NITU mechanism even as it <u>preserves the continued existence of the</u>

15   <u>easement</u>, points to the government's liability for transforming the purpose of the easement beyond

16   what the original parties to the transaction contemplated." *Id.* (emphasis added)*; see also Geneva*

17   *Rock Prods., Inc. v. United States,* 107 Fed. Cl. 166, 173 (2012) (same); *Toews v. United States,*

18   376 F.3d 1371, 1831 (Fed. Cir. 2004) (acknowledging the continued existence of the rail easement

19   but stating that possible use of those easements would not bar compensation: "The . . . possibility

20   that one day <u>the railroad easements</u> might be used for a light rail system do not change the

21   [takings] analysis.") (emphasis added).[11]

22

23   _____

[11] If, as plaintiffs contend, "the railroad easements" are contingent on STB reactivation but freight use never resumes,
"the railroad easements" <u>never</u> can be used for a light rail system because STB reactivation is only for freight use. 49

24   U.S.C.A. § 10501 (STB does not have jurisdiction over "mass transportation provided by a local government
authority"); *In re Ballard Terminal R.R. Co.,* AB 6 (SUB-465X), 2013 WL 3962853, at *5 (S.T.B. Aug. 1, 2013)

25   (noting in the context of a reactivation request the STB's "statutory duty to preserve and protect freight rail
service"). Plaintiffs' formulation is thus contrary to the *Haggart* decision which compensated them for use of the
easement for passenger rail.

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 14

2.    **"Change in use from railroad purposes" did not extinguish the rail easement.**

Plaintiffs assert that the "railroad purposes easement extinguishes because of the change in use from railroad purposes," citing to a string of cases that supposedly support that proposition. Dkt. 55 at 19. But <u>none</u> addresses the question presented by plaintiffs' motion, whether the rail easement still exists. Rather, in every cited case the court analyzed only whether a taking occurred or the proper method of valuing the "before." When considered in context, the cases support a conclusion exactly the opposite of plaintiffs' position; a taking occurred <u>because</u> the original easements still exist and clear title did not revert to plaintiffs as it would have under state law.

Plaintiffs' "leading" case, *Macy Elevator v. United States*, 105 Fed. Cl. 195 (Fed. Cl. 2012), illustrates this. There, the Court of Federal Claims found that *but for* the railbanking statute, "under Indiana law the railroad purposes easements terminated when the railroad stopped using the easements for railroad purposes and instead transferred the easements to a trail operator for use as a recreational trail." *Id.* at 199; *see also id.* at 203 n.6. As a result, the court held that the "'before' condition of plaintiffs' properties must be valued as property unencumbered by the railroad purpose easements." *Id* at 199.

The court reached its conclusion because the statute "blocked" plaintiffs' reversionary interests – the interest the property owners would have had if the railbanking statute had not preempted Indiana law "terminat[ing]" the "railroad purposes easements." *Macy Elevator*, 105 Fed. Cl. at 201 ("The continued imposition of the recreational trail easement authorized by the NITU 'blocked' plaintiffs' 'state law reversionary interests' in the determinable railroad purpose easements.") (citation omitted). The court did not expressly address the question of whether the railroad easement still remained, but its reasoning that the NITU "blocked" plaintiffs' reversionary interest necessarily means the original railroad easement still existed.

The other cases plaintiffs cite are similar. They hold that the NITU "blocked" or "prevented" reversion of unencumbered land to the landowners, resulting in a taking valued at the difference between the unencumbered property right plaintiffs would have had but for the

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

railbanking statute and the encumbered value.[12]  None of these cases held that the original railroad

easement no longer existed.  During their takings case, plaintiffs in the present case acknowledged

this same effect:

> A taking occurs because the NITU blocks the landowners' interest under federal law. . . .
> [T]he Trail Act prevents the operation of state laws that would otherwise come into effect
> upon abandonment, specifically, property laws that would "result in extinguishment of
> easements for railroad purposes and reversion of rights-of-way to abutting landowners."

Thomsen Decl. Ex. 19 at 2 n.1, 7.

In fact, many Court of Federal Claims cases recognize that because the reversionary rights

are blocked, the rail easement continues.  *See Geneva Rock Prods., Inc. v. United States*, 107 Fed.

Cl. 166, 168 n.3 (2012) ("Rail-banking under the Trails Act preserves railroad-purpose easements

which otherwise would terminate by operation of law, thus retaining the easements for potential

---

[12] *Anna F. Nordhus Family Trust v. United States*, 98 Fed. Cl. 331 (2011) (NITU "blocked the reversion of the
easement"); *Farmers Coop. v. United States*, 98 Fed. Cl. 797 (2011) ("state law reversionary interests that would
normally vest upon abandonment are blocked" upon issuance of NITU); *Capreal, Inc. v. United States*, 99 Fed. Cl.
133, 136 (2011) ("the Trails Act prevents the operation of state . . . property laws that would result in extinguishment
of easements for railroad purposes and reversion of rights of way to abutting landowners"); *Gregory v. United States*,
101 Fed. Cl. 203, 222 (2011) (the "NITU blocked the reversion of the easement to the fee simple landowners
following abandonment"); *Thompson v. United States*, 101 Fed. Cl. 416, 434 (2011) (plaintiffs "were forestalled from
acquiring their reversionary fee simple absolute interest" when the NITU issued); *Dana R. Hodges Trust v. United
States*, 101 Fed. Cl. 549, 551 (2011) ("state law reversionary interests that would normally vest upon abandonment are
blocked"); *Raulerson v. United States*, 99 Fed. Cl. 9, 11 (2011) ("Because the Trails Act expressly prevents such
reversion, plaintiffs have been subject to a taking . . . ."); *Rogers v. United States*, 101 Fed. Cl. 287, 294 (2011) (NITU
"blocked an abandonment of the railroad easement and prevented the fee simple, unencumbered by that railroad
easement, from reverting to Plaintiffs"); *Whispell Foreign Cars, Inc. v. United States*, 100 Fed. Cl. 529, 534 (2011) ("a
taking occurs when . . . state law reversionary interests are effectively eliminated in connection with a conversion of a
railroad right-of-way to trail use") (citation omitted); *Jenkins v. United States*, 102 Fed. Cl. 598, 615 (2011) ("STB
works to block the ability of the underlying fee owners to reclaim their property free of any railroad easement");
*Adkins v. United States*, 2012 U.S. Claims LEXIS 1975, at *24 (Fed. Cl. July 10, 2012) ("But for issuance of the
NITU, under Iowa law the easement would have reverted back to plaintiffs upon cessation of railroad operations, and
plaintiffs would have enjoyed land unencumbered by any easement."); *Rhutasel v. United States*, 105 Fed. Cl. 220,
230 (2012) ("the NITU, which blocked the reversion of state law property rights, amounted to a taking of Plaintiffs'
reversionary interests"); *McClurg Family Farm, LLC v. United States*, 115 Fed. Cl. 1, 5-6 (2014) ("takings can arise . .
. where the NITU interferes with the landowner's right to reversion of an unencumbered fee"); *Toscano v. United
States*, 107 Fed. Cl. 179, 188 (2012) ("before value must reflect the value of the land without an easement of any
kind"); *Ellamae Phillips Co. v. United States*, 99 Fed. Cl. 483, 484 (2011) (plaintiff concedes the Trails Act does not
constitute abandonment); *Ybanez v. United States*, 98 Fed. Cl. 659 (2011) ("conversion of the right-of-way to public
use . . . effected a . . . taking of plaintiffs' property"); *Burgess v. United States*, 109 Fed. Cl. 223, 239-40 (2013) ("the
NITU . . . operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary
interests in the right-of-way") (citation omitted); *Thomas v. United States*, 106 Fed. Cl. 467, 474 (2012) (actions
pursuant to NITU "exceed the scope of that [railroad purpose] easement and thereby prevent expiration of the
easement and reversionary interests from vesting in the fee owners").

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 16

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

later reactivation of railroad use."); *Haggart*, 108 Fed. Cl. at 76 n.3 (same); *Biery v. United States*, 99 Fed. Cl. 565, 580 (2011) ("The court finds that the issuance of the NITUs prevented the expiration of the railroad easements that would have otherwise been abandoned and thus the issuance of the NITUs resulted in a taking of the plaintiffs' reversionary interests."); *Barclay v. United States*, 443 F.3d 1368, 1374 (Fed. Cir. 2006) (after NITU's issuance "the easement continued in existence beyond the time when it otherwise would have been abandoned").

The comments made in oral argument by Judge Moore in *Ladd v. United States*, 630 F.3d 105 (Fed. Cir. 2010), and Justice Scalia in *Preseault I* do not suggest a different result. *See* Motion at 17. Both jurists were responding to the government's argument that the use of the right-of-way as a trail served a railroad purpose. Neither addressed the continued existence (or extinguishment) of the rail easements. To the contrary, both courts held that a taking occurred because the issuance of the NITU prevented the reversion of the property interests at issue and kept the easement in place:

> This [statutory] language gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements . . . . [F]requently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations . . . . By deeming interim trail use to be like discontinuance rather than abandonment, Congress prevented property interests from reverting under state law.

*Preseault I*, 494 U.S. at 8; *see also Ladd*, 630 F.3d at 1024 ("The NITU is the government action that prevents the landowners from possession of their property unencumbered by the easement.").

Nor did the Federal Circuit in *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005), "hold," as plaintiffs claim, "that by allowing railbanking, the railroad easement is abandoned." Motion at 20. In *Hash*, the railroad had actually abandoned the right of way prior to railbanking. The court stated, "On the railway's abandonment of its right-of-way these owners were disencumbered of the railway easement, and upon conversion of this land to a public trail, these owners' property interests were taken for public use in accordance with the principles set forth in the *Preseault* cases." *Hash*, 403 F.3d at 1318. The Federal Circuit made clear in *Ellamae Phillips*

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 17

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

*Co. v. United States*, 564 F.3d 1367 (Fed. Cir. 2009), that in *Hash* the railway had abandoned the right-of-way before railbanking, not as a matter of law <u>due</u> to railbanking. *Id.* at 1373. Thus the *Hash* taking was analyzed under the third prong of *Preseault,* because at the time of the NITU the property owner "held a fee simple unencumbered by the easement." *Id.* Cases citing the "disencumbered" language of *Hash* for the proposition that the NITU's issuance extinguishes the railway easement overlook this crucial factual difference.

Plaintiffs rely heavily on *Preseault* but omit mention of subsequent cases in that series evidencing the continued existence of the railroad easement. In *Preseault I*, the Supreme Court established that operation of the railbanking statute could constitute a taking. In *Preseault II*, the Federal Circuit's plurality opinion outlined how to analyze a railbanking takings claim. *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996). But in *State v. Preseault*, 652 A.2d 1001 (Vt. 1994) (*Preseault III*), the Vermont Supreme Court held that the "the original railroad easement" still existed. The court affirmed a permanent injunction enjoining the property owners, the Preseaults, from interfering or encroaching on the right of way held by the State. The court held:

> To construe the State's interest in the right-of-way as less than the interest of an operating railroad creates the risk of frustrating Congress' clear intent and purpose. The fact that defendants' excavation activities do not present a threat to the bicycle and pedestrian path is irrelevant <u>because these activities impinge upon the original railroad easement.</u>

*Id.* at 1003 (emphasis added). The court found that the state (the trail sponsor) was "the holder of a railroad easement" and thus "enjoys the right to the exclusive occupancy of the land, and has the right to exclude all concurrent occupancy in any mode and for any purpose." *Id.* While *Preseault III* was decided while *Preseault II* was awaiting its en banc decision, the Vermont Supreme Court cited its analysis and these passages with approval ten years later in *Preseault v. City of Burlington*, 908 A.2d 419, 422 (Vt. 2006) (*Preseault IV*). *See also Wild v. Brooks*, 862 A.2d 225, 230 (Vt. 2004) (describing facts of *Preseault III*: "the State filed a trespass action against abutters who claimed interest in a railroad right-of-way owned by the State").

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 18

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

**D.    The Fact That Under Washington State Law the Easement Would Have Been Extinguished but for the Railbanking Statute Is the Reason There Is a Taking.**

Plaintiffs rely heavily on the Washington decisions of *Lawson v. State*, 107 Wn.2d 444, 730 P.2d 1308 (1986), and *King County v. Squire Inestment Co.*, 59 Wn. App. 888, 801 P.2d 1022 (1990), but again neither addresses the particular issue presented by this motion. Both decisions hold that cessation of railroad operations and commencement of trail use constituted abandonment of the rail easement, which is a basic tenet of Washington State property law. But there was no railbanking statute in these cases to block abandonment.

The fact that the railbanking statute blocked abandonment in *Haggart* is what entitled plaintiffs to compensation. Because the railbanking statute <u>prevented</u> abandonment and a reversion to plaintiffs, they were entitled to compensation – averaging over a half million dollars each – based on the difference between the property's value unencumbered (what would have occurred under state law) and its value encumbered by a "general easement" (what did occur under the railbanking statute). *Haggart*, 108 Fed. Cl. at 96.

Plaintiffs nonetheless argue that "[under Washington law,] change in use from railroad purposes to trail purposes constitutes an abandonment of an easement . . . binding precedent on the Defendants herein . . . that the railroad purpose easements were extinguished by the Trails Act and no longer exist." Motion at 24. That statement is directly contrary to the railbanking statute itself, which states, "interim [trail] use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. 1247(d).

Contrary to plaintiffs' assertion, Washington law does not address the issue here, which is what property interests exist <u>after</u> the federal taking occurs under the railbanking statute. Plaintiffs rely heavily on *Lawson*, but in that case the federal railbanking statute was not at issue. The <u>state</u> statute involved in *Lawson* did not attempt to preserve the railroad easement but merely allowed conversion of a railroad right-of-way into a trail. *See Lawson,* 107 Wn.2d at 452-53 (citing RCW 64.04.180 and .190). Thus, the Court in *Lawson* held that change of use from rail to trail exceeded

the scope of the original easement and must be compensated.[13]  *Lawson* was silent on the federal

question of whether the federal railbanking statute extinguished the original rail easement because

the state statute did not purport to preserve the rail easement.  Likewise, *Squire Investment* did not

involve the federal railbanking statute.  There, the ICC (the STB's predecessor) had issued a

certificate of abandonment prior to trail use, opposite the facts in this case.  *Squire Inv. Co.*, 59

Wn. App. at 891.  As with *Lawson,* the decision in *Squire Investment* did not address the property

interests remaining after railbanking because railbanking had not occurred.

Plaintiffs ignore the more recent Washington case of *Good v. Skagit County*, 104 Wn. App.

670, 17 P.3d 1216 (2001), where the court distinguished *Lawson.*  There, property owners sued

Skagit County and, relying on *Lawson,* claimed that that the railroad operator had abandoned the

underlying rail corridor, providing the property owners "full possessory rights to the land."  104

Wn. App. at 673-74.  The Court of Appeals rejected the applicability of *Lawson* for reasons that

apply equally to this case:

> *Lawson* did not involve an alleged taking under Section 1247(d) of the Trails Act.  The
> local trail manager, King County, acquired use of an *abandoned* corridor under 49 U.S.C.
> § 10906 and 49 C.F.R. § 1152.28 . . . . *Lawson* has no application here.  The Court did
> not discuss Section 1247(d) of the Trails Act.  In this case, Skagit County acquired the
> disputed property under the Trails Act. . . .  By deeming interim trail use to be a
> discontinuance rather than abandonment, Congress effectively prevented property interest
> from reverting under state law.  During the interim trail use, the STB retains jurisdiction
> over the line.  So long as the STB retains jurisdiction, state law, including that governing
> creation and extinguishment of easements, is preempted.

*Good*, 104 Wn. App. at 676 (emphasis added) (citations omitted).  As the reasoning in *Good*

illustrates, Washington law does not apply to the question of whether the rail easement survives

issuance of the NITU.  Abandonment under state law does not occur, and the original rail easement

---

[13] The Federal Circuit commented that *Lawson* was "on all fours" with *Preseault II* because the court agreed with *Lawson* that "change in use from 'rails to trails' constitutes abandonment of [the rail] easement," that abandonment under state law causes the property interest to revert, and that the statute blocking that reversion constituted a taking. *Preseault v. United States*, 100 F.3d 1525, 1543 (Fed. Cir. 1996) ("Most state courts that have been faced with the question of whether conversion to a nature trail falls within the scope of an original railroad easement have held that it does not. *Lawson* is an example of a case practically on all fours with the case before us.") (citation omitted).

1    remains intact.

2    **E.    Even if Extinguished, the Rail Easement Was Replaced by a Broader and Equally**
      **Exclusive Easement.**

3
4        Plaintiffs' argument that the rail easement was extinguished is inconsistent with the holding

5    in *Haggart* that plaintiffs' takings claim included a "general easement" that allowed for

6    "recreational trail use with the potential for future railway use by way of rail-banking or possible

7    future development of a commuter rail line."  108 Fed. Cl at 96.  This characterization is best

8    conceived of as the continued existence of the rail easement with trail use made an incidental use

9    as a matter of federal law.  Federal law only requires that the trail be permitted in the right-of-way,

10   while local laws may regulate and proscribe the nature of the trail.  *See, e.g., Friends of the East*

11   *Lake Sammamish Trail*, 361 F. Supp.2d at 1247 ("state and local governments [may] impose

12   appropriate . . . regulations on recreation trails") (citation omitted).

13       But even if the Court accepted on its face the language used by some courts that the rail

14   easement was "replaced by" or "converted to" a new easement, the courts that have discussed the

15   scope of the "new" easement have held that it is broader and maintains the same exclusivity as the

16   original railroad purposes easement.  The decision in *Illig v. United States*, 58 Fed. Cl. 619 (2003),

17   illustrates the breadth of the easement.  There, the parties disagreed on whether the takings

18   valuation must account for utility licenses that burdened the plaintiffs' property.  *Id.* at 621.  In

19   resolving the issue, the court considered the question of "what right of use, if any, plaintiffs have

20   as underlying fee owners in the land burdened by the easement[?]"  *Id.*  The court held that while

21   the trail use was a "new" easement, it nonetheless maintained the same "exclusivity" as the prior

22   railroad purposes easement:

23           Although we have previously found that interim trail use, or railbanking, was not a
             legitimate railroad purpose, the stated intent of the government in creating the Trails Act
24           was to preserve railroad rights-of-way as they existed. . . . [The United States] wished to
             maintain the status quo, securing for [the trail sponsor] whatever rights [the railroad]
             previously held in the easement. . . . We therefore conclude that the Trails Act imposed a
25           new easement across plaintiffs' properties which retained <u>essentially the same
             characteristics as the original easement, both in its location and exclusivity.</u>

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX, (206) 623-8717

1  *Id.* at 631 (emphasis added) (citations omitted).  As a result, the court held that compensation for

2  the taking must include the utility licenses:

> It was the intent of the Trails Act to ensure that [the trail sponsor] had the same rights in
> its easement that [the railroad] held, and that consequently, in determining the value of
> the easement imposed on plaintiffs by the government, we must include the value of [the
> trail sponsor's] authority to grant licenses to [the electrical company] and other utilities,
> at least insofar as they are embraced by railroad use.
>                                         * * *
> The evidence establishes that it was the intent of [the railroad] and [the trail sponsor] that
> [the trail sponsor] would have the same relationship with the licensees that [the railroad]
> previously held.  This is entirely consistent with the stated purpose of the Trails Act to
> preserve the railroad corridor in essentially its original character in order that railroad use
> could one day be reinstated.

9  *Id.* at 632-34.  The court concluded that so long as utility use was consistent with the original

10 railroad easement, the trail sponsor held all authority once held by the railroad to allow it.  *Id.*[14]

11      Several other courts have followed the reasoning in *Illig* and concluded that the easement

12 resulting from issuance of the NITU is broader than the original railroad easement.  For instance,

13 in *Palmetto Conservation Found. v. Smith*, 642 F. Supp. 2d 518 (D.S.C. 2009), the court held that

14 the trail easement "exceeds the scope of the original easement" in the context of deciding that the

15 owner of the underlying fee could be totally excluded from the easement.  *Id.* at 530.  In *Capreal v.*

16 *United States*, 99 Fed. Cl. 133 (2011), the court found "that the federal entity's issuance of the

17 NITU blocked the extinguishment of Plaintiffs' easements pursuant to state law and imposed a

18 new use on the easements that was broader in scope than the original easements."  *Id.* at 140

19 (emphasis added).

20      The courts' reasoning in *Illig* and the statements in cases such as *Capreal* and *Palmetto* are

21 consistent with the Port (and its successors-in-interest) using the right-of-way at least as BNSF did,

---

[14] Regardless of its label as a rail or trail easement, King County's easement is exclusive and plaintiffs may not burden the easement area without the County's permission.  *See, e.g., Northwest Supermarkets v. Crabtree*, 54 Wn.2d 181, 186, 338 P.2d 733 (1959) (having granted a street easement, fee owner could not grant to another entity a sewer easement because "there remain[ed] no interest in realty that the [fee owner] could convey").  As the court in *Illig* explained, this exclusivity is necessary so that the trail sponsor may "assume full responsibility for managing the right-of-way and for any legal liability," and to assure "that the right-of-way is kept available for future reconstruction and reactivation for rail service."  *Illig*, 58 Fed. Cl. at 631.

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 22

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1  provided that the uses are consistent with that original railroad purpose.  Like the utility use at

2  issue in *Illig*, the Port granted an easement to Puget Sound Energy just as BNSF had done

3  hundreds of times earlier to other public utilities.  As the court held in *Illig*, that use is appropriate

4  provided that the easement is consistent with a railroad purpose.

5       Thus if this Court grants the plaintiffs' motion and declares that the rail easement has been

6  extinguished and replaced by a trail easement, the scope of that easement – which all prior courts

7  have agreed is at least as broad as the prior rail easement – must still be determined.[15]

8                          **V. CONCLUSION**

9       There is no ambiguity in the statute:  it preserves the railroad easements.  The court in

10 *Haggart* appreciated that fact, and allowed plaintiffs to receive an award millions of dollars for the

11 preservation of those railroad easements with additional trail use.  The plaintiffs' request that this

12 Court declare that the railroad easements were in fact extinguished by railbanking and should be

13 denied.

14 /

15 /

16 /

17 /

18 /

19 /

20 /

21

22 [15] Although not raised by this motion, the current uses of the corridor are "incidental uses" consistent with a railroad purpose, including utilities that have no relationship to train operations.  *See Neitzel v. Spokane Int'l Ry. Co.*, 80 Wash.

23 30, 39, 141 P. 186 (1914) (use of a railroad easement is appropriate "so long as the property is applied to a use incidental to, or which contributes to, the public business of the transportation company"); *Kershaw Sunnyside v. Interurban Lines*, 156 Wn.2d 253, 276, 126 P.3d 16 (2006) (absent a statutory provision applicable only to

24 telecommunications hardware which required (rather than permitted) eminent domain proceedings for its installation, the incidental use doctrine "may be sufficiently compelling to find the telecommunications cable an incidental use [of the railroad] and conclude no compensation was due" the fee holder); *Washington Sec. & Inv. Corp., v. Horse Heaven*

25 *Heights, Inc.*, 132 Wn. App. 188, 201, 130 P.3d 880 (2006) (characterizing *Kershaw* as "strongly indicat[ing] an endorsement of the interpretation of the incidental use doctrine" applied by the Court of Appeals).

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 23

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1    DATED this 2nd day of February, 2015.

2                      CALFO HARRIGAN LEYH & EAKES LLP

3

4                  By_____ *s/ Timothy G. Leyh*
                      Timothy G. Leyh, WSBA#14853

5                  By_____ *s/ Randall Thomsen*
                      Randall Thomsen, WSBA#25310

6

7                  By_____ *s/ Kristin Ballinger*
                      Kristin Ballinger, WSBA#28253

8

9                    999 Third Avenue, Suite 4400
                    Seattle, WA 98104

10                 Telephone: (206) 623-1700
                    Fax: (206) 623-8717

11                 timl@calfoharrigan.com
                    randallt@calfoharrigan.com
                    kristinb@calfoharrigan.com

12

13                 *Attorneys for Defendant Port of Seattle*

14

15

16

17

18

19

20

21

22

23

24

25

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Daryl A. Deutsch WSBA#11003
daryl@rdtlaw.com

Thomas S. Stewart
Elizabeth McCulley
stewart@bscr -law.com
mcculley@bscr -law.com

Gavin W. Skok, WSBA#29766
James E. Brietenbucher, WSBA#27670
Courtney Seim, WSBA#35352
Bryan J. Case, WSBA#41781
gskok@riddellwilliams.com
jbreitenbucher@riddellwilliams.com
cseim@riddellwilliams.com
bcase@riddellwilliams.com

David J. Hackett, WSBA#21236
Andrew W. Marcuse, WSBA#27552
david.hackett@kingcounty.gov
andrew.marcuse@kingcounty.gov

Desmond L. Brown, WSBA #16232
Loren G. Armstrong, WSBA #33068
desmond.brown@soundtransit.org
loren.armstrong@soundtransit.org

DATED this 2nd day of February, 2015 at Seattle, Washington.

_____
*s/ Lynn Van Eyck*
Lynn Van Eyck

DEFENDANT PORT OF SEATTLE'S
OPPOSITION TO PLAINTIFFS' "MOTION FOR
DECLARATORY JUDGMENT" (14-cv-00784-
JCC) - 25

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717