THE HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| SCOTT AND KATHRYN KASEBURG, *et al*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>PORT OF SEATTLE, a municipal corporation;<br>PUGET SOUND ENERGY, INC., a<br>Washington for profit corporation; KING<br>COUNTY, a home rule charter county;<br>CENTRAL PUGET SOUND REGIONAL<br>TRANSIT AUTHORITY, a municipal<br>corporation; and CASCADE WATER<br>ALLIANCE,<br><br>                    Defendants. | Case No. 14-cv-00784-JCC<br><br>**DEFENDANTS' MOTION FOR<br>PARTIAL SUMMARY JUDGMENT ON<br>PLAINTIFFS' DECLARATORY<br>JUDGMENT CLAIM**<br><br>**NOTED FOR:<br>FRIDAY, JUNE 19, 2015**<br><br>**ORAL ARGUMENT REQUESTED** |

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1

2

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

I.      INTRODUCTION ....................................................................................................1

II.     FACTUAL BACKGROUND....................................................................................1

III.    STATEMENT OF ISSUE .........................................................................................4

IV.     ARGUMENT ............................................................................................................4

        A.      Summary Judgment Is Appropriate Because the Issue Is Resolvable as a
                Matter of Law. ..............................................................................................4

        B.      The Trails Act Preserves Railroad Easements While Also Allowing for
                Interim Use as a Trail.....................................................................................5

                1.      The plain language of the Trails Act preserves railroad easements .......5

                2.      Congress, Courts, and the Surface Transportation Board have all
                        recognized that preserving railroad easements through railbanking
                        was a primary purpose of the statute. ....................................................8

                3.      The Surface Transportation Board has repeatedly recognized that
                        railroad easements in a railbanked corridor are preserved. .................11

                4.      Court decisions addressing the status of railbanked property rights
                        recognize that the Trails Act preserves railroad easements.................14

        C.      The Takings Valuations Applied by the Court in *Haggart* and Other Takings
                Cases Demonstrate That the Original Railroad Easements Continue to Exist
                and to Burden Plaintiffs' Land.........................................................................17

        D.      No Cases Hold That Railroad Easements Are Extinguished or Diminished
                When a Corridor Is Railbanked Under the Trails Act. .....................................19

        E.      The Fact That Under Washington Law the Easement Would Have Been
                Extinguished but for the Trails Act Demonstrates How the Trails Act
                Preserves Railroad Easements. .........................................................................22

V.      CONCLUSION........................................................................................................24

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ...............................................5

*Barclay v. United States*,
  443 F.3d 1368 (Fed. Cir. 2006) ...........................................................................21, 22

*Becker v. Surface Transp. Bd.*,
  132 F.3d 60 (1997) ...................................................................................................13

*Biery v. United States*,
  99 Fed. Cl. 565 (2011) ..............................................................................................21

*Capreal, Inc. v. United States*,
  99 Fed. Cl. 133 (2011) ................................................................................................8

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) .............................................5

*Chevy Chase Land Co. v. United States*,
  733 A.2d 1055 (Md. 1999) .........................................................................................2

*City of Ford v. U.S.*,
  106 Fed. Cl. 136 (2012) ............................................................................................22

*Dana R. Hodges Trust v. United States*,
  101 Fed. Cl. 549 (2011) ............................................................................................15

*Friends of the E. Lake Sammamish Trail v. City of Sammamish*,
  361 F. Supp. 2d 1260 (W.D. Wash. 2005) ............................................................8, 11

*Geneva Rock Prods., Inc. v. United States*,
  107 Fed. Cl. 166 (2012) ............................................................................................20

*Good v. Skagit County*,
  104 Wn. App. 670, 17 P.3d 1216 (2001) .............................................................23, 24

*Grantwood Village v. Missouri Pac. RR Co.*,
  95 F.3d 654 (8th Cir. 1996) ......................................................................................15

*Haggart v. United States*,
  108 Fed. Cl. 70 (2012) ......................................................................................*passim*

*Haggart v. United States*,
    116 Fed. Cl. 131 (2014) .................................................................................4

*Illig v. United States,*
    58 Fed. Cl. 619 (2003) ...................................................................15, 16, 17

*Jenkins v. United States,*
    102 Fed. Cl. 598 (2011) ..........................................................................9, 18

*King County v. Squire Inv. Co.,*
    59 Wn. App. 888, 801 P.2d 1022 (1990).................................................22, 23

*Lane v. Port of Seattle,*
    178 Wn. App. 110, 316 P.3d 1070 (2013).....................................................3

*Lawson v. State,*
    107 Wn.2d 444, 730 P.2d 1308 (1986)..............................................6, 22, 23

*Longnecker Property v. United States,*
    105 Fed. Cl. 393 (2012) ..............................................................................23

*Macy Elevator v. United States,*
    105 Fed. Cl. 195 (Fed. Cl. 2012) ................................................................20

*McCann Holdings, Ltd. v. U.S.,*
    111 Fed. Cl. 608 (2013) ..............................................................................19

*Moore v. United States,*
    61 Fed. Cl. 73 (2004) ..................................................................................19

*Nat'l Assoc. of Reversionary Property Owners v. Surface Trans. Bd.,*
    158 F.3d 135 (D.C. Cir. 1998).....................................................................21

*Nat'l Wildlife Fed'n v. I.C.C.,*
    850 F.2d 694 (D.C. Cir. 1988).................................................................21, 22

*Palmetto Conservation Found. v. Smith,*
    642 F. Supp. 2d 518 (D.S.C. 2009)........................................................16, 19

*Preseault v. Interstate Commerce Comm'n,*
    494 U.S. 1, 110 S. Ct. 914, 108 L. Ed. 2d 1 (1990)..............................8, 9, 22

*Preseault v. City of Burlington,*
    908 A.2d 419 (Vt. 2006) ...........................................................................15

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

*Preseault v. United States,*
    100 F.3d 1525 (Fed. Cir. 1996) ........................................................... 14, 23

*Rhutasel v. United States,*
    105 Fed. Cl. 220 (2012) .............................................................................. 18

*State v. Preseault,*
    652 A.2d 1001 (Vt. 1994) ........................................................................... 15

*Trevarton v. South Dakota*,
    2015 WL 1459620 (D.S.D. Mar. 29, 2015) ............................................... 17

*Wild v. Brooks*,
    862 A.2d 225 (Vt. 2004) ............................................................................. 15

**Statutes and Regulations**

16 U.S.C. § 1247(d) ........................................................................... 1, 2, 6, 7

49 U.S.C. § 10906 ...................................................................................... 24

49 C.F.R. 1152.29(c)(3) .............................................................................. 11

49 C.F.R. 1152.29(d)(2) ....................................................................... 11, 21

**Legislative History**

H.R. Rep. No. 98-28 (1983) ......................................................................... 9

**Administrative Decisions and Rulemaking**

*In re Ballard Terminal R.R. Co.,*
    STB Finance Docket No. 35731, 2014 WL 7405859 (Dec. 30, 2014) ................ 11, 12

*In re Baltimore and Ohio R. Co.,*
    ICC Docket No. AB-19 (Sub-No. 112), 1990 WL 287371 (March 2, 1990) ............. 13

*In re BNSF Ry. Co.,*
    STB Finance Docket No. AB 6 (Sub. No. 464X), 2008 WL 4718449
    (Oct. 27, 2008) ...................................................................................... 11, 21

*In re CSX Transp., Inc.,*
    STB Finance Docket No. AB-55 (Sub-No. 514X), 1997 WL 598035
    (Sept. 30, 1997) ........................................................................................... 14

DEFS.' MOT. PARTIAL SUMMARY
JUDGMENT ON PLS.' DECLARATORY
JUDGMENT CLAIM (14-cv-00784-JCC) - iv

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

*In re Georgia Great Southern Div., South Carolina Cent. R.R. Co.*,
        STB Docket No. AB-389 (Sub-No. 1X), 2003 WL 21132515 (May 16, 2003)..........12

*In re Kansas Eastern R.R., Inc.*,
        STB Finance Docket No. AB-563 (Sub-No. 1X), 2006 WL 1516602
        (June 1, 2006) ...............................................................................................13

*In re KCT Railway Corp.*,
        ICC Docket No. AB-335 (Sub-No. 2X), 1992 WL 311582 (Oct. 26, 1992) ..............13

*In re King County*,
        STB Finance Docket No. 35148, 2009 WL 2979430 (Sept. 18, 2009) .......................11

*In re R.J. Corman R.R. Co. /Pennsylvania Lines, Inc.*,
        STB Finance Docket No. 35116, 2009 WL 221010 (July 27, 2009) ..........................12

*In re T & P Railway*,
        STB Finance Docket No. AB-381 (Sub-No. 1X), 1997 WL 68211 (Feb. 20, 1997) ...13

*Rail Abandonments-Use of Rights-of-Way As Trails (49 CFR Parts 1105 & 1152)*,
        2 I.C.C.2d 591, 1986 WL 68617 (Apr. 16, 1986)....................................................8, 13

*Rail Abandonments-Use of Rights-of-Way As Trails-Supplemental Trails Act Procedures*,
        Ex Parte No. 274 (Sub-No. 13), 1989 WL 238631 (May 18, 1989)......................10, 13

**Other Authorities**

65 Am. Jur. 2d Railroads § 55 (2014) ...................................................................................10

Lewis Simes & Hon. John Borron Jr.,
        *Simes and Smith The Law of Future Interests* (3rd ed. 2002) .....................................10

U.S. Gov't Accountability Office,
        GAO/RCED-00-4, *Surface Transportation: Issues Related to Preserving Inactive
        Rail Lines as Trials* (1999) ...............................................................................14

Webster's Third New Int'l Dictionary (2002) ..........................................................................7

DEFS.' MOT. PARTIAL SUMMARY
JUDGMENT ON PLS.' DECLARATORY
JUDGMENT CLAIM (14-cv-00784-JCC) - v

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

# I.  INTRODUCTION

In accord with this Court's April 23, 2015 decision, the Port of Seattle (the "Port"), Puget Sound Energy, King County, and the Central Puget Sound Regional Transit Authority ("Sound Transit") (collectively "Defendants") move for partial summary judgment and ask this Court to hold that "railbanking" pursuant to 16 U.S.C. 1247(d) (the "Trails Act") both preserves existing railroad easements and authorizes interim trail use.  Recognizing that the legal impact of railbanking on existing railroad easements in the corridor "lies at the heart of the parties' dispute," this Court rejected plaintiffs' legal argument that railbanking "extinguished" all railroad easements along the Eastside Rail Corridor ("the corridor").  Order re Pls.' Mot. for Decl. J. at 11-17 (Dkt. 91).   Defendants ask the Court to affirmatively rule, as a matter of law, that railbanking under the Trails Act preserved the railroad easements in the corridor and allowed for interim use of the corridor as a trail.[1]

# II.  FACTUAL BACKGROUND[2]

**BNSF's Divestiture of the Corridor.**  The BNSF Railway Company ("BNSF") owned both fee and easement rights in the corridor and conducted railroad operations over its 42-mile length.  In 2003, BNSF decided to sell the corridor.  Thomsen Decl. Ex. 1 at 1 (Dkt. 77-1).  It provided the opportunity to the Puget Sound region to maintain and preserve the corridor for transportation purposes.  *Id.*  In response, eight governmental jurisdictions[3] along the corridor engaged in a multi-year public process to evaluate the future of the corridor and its potential

---

[1] This motion does not ask this Court to decide the entirety of plaintiffs' declaratory judgment claim by determining the precise scope of the property interests obtained from BNSF, but only that all railroad easements obtained from BNSF were preserved through railbanking.

[2] More robust descriptions of the facts are in the briefs filed in opposition to plaintiffs' motion for declaratory judgment.  *See* Dkt. 66, 67, 72, 73.  This motion relies upon the declarations in support of those oppositions.  *See* Robert Jackson Decl. (Dkt. 68); Christie True Decl. and exhibits (Dkt. 69, 69-1 through 69-28); David Hackett Decl. and exhibits (Dkt. 71, 71-1 through 71-3); John Sleavin Decl. (Dkt. 74); Loren Armstrong Decl. and exhibits (Dkt. 75, 75-1 through 75-9); Randall Thomsen Decl. and exhibits (Dkt. 77, 77-1 through 77-20); and Loren Armstrong Decl. and exhibits (Dkt. 78, 78-1).

[3] These jurisdictions were King County, Snohomish County, and the Cities of Bellevue, Kirkland, Redmond, Renton, Snohomish, and Woodinville.   The Port, Sound Transit, and the Washington State Department of Transportation also participated in the process.

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 1
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

acquisition.  *Id.*  BNSF, the Port, and King County entered into a series of interrelated

agreements that transferred the corridor to the Port and preserved the underlying right of way

for existing and future transportation purposes.  True Decl. Exs. M and N (Dkt. 69-13, 69-14).

**Railbanking of the Corridor.**  As the agreements required, in September 2008, BNSF

filed a Petition for Exemption with the Surface Transportation Board ("STB") to railbank the

corridor.  Thomsen Decl. Ex. 5 (Dkt. 77-6).  In its petition, BNSF explained that it was

coordinating its petition as part of a "multi-transaction arrangement" whereby the Port would

"purchase the Line from BNSF with track and structures intact" and King County would

"railbank the Line under 16 U.S.C. § 1247(d)," allowing the parties to "determine the Line's

ultimate use following receipt of input from the public after the line is railbanked."  *Id.* at 4.

BNSF sought this exemption "so the Port and County can execute their plans for the Line."  *Id.*

Contemporaneously, King County filed a statement expressing its willingness to

assume financial responsibility over the corridor and requesting issuance of a Notice of Interim

Trail Use ("NITU").  Thomsen Decl. Ex. 6 (Dkt. 77-7).  Thus, although BNSF filed a petition

for exemption to authorize abandonment, the purpose of that petition was to facilitate the

railbanking and transfer of the corridor to the Port and King County.[4]

On October 27, 2008, the STB issued a NITU based on King County's and BNSF's

expressed willingness to "negotiate for trail use."  Thomsen Decl. Ex. 7 at 2 (Dkt. 77-8).  The

---

[4] The petition to abandon was a necessary step in the railbanking process:

> [To] accept [that] the railroad's acts taken in pursuit of federal regulatory approval for "abandonment" as . . . demonstrat[ing] an intent to abandon an easement under state law, it would create an irreconcilable dilemma for railroads wishing to pursue rails-to-trails agreements or otherwise dispose of their property interests in right-of-ways.  The railroad could not pursue a rails-to-trails agreement without filing an application for regulatory abandonment at the ICC, but the actions taken to pursue such an application, and the application itself, would constitute evidence of abandonment for state law purposes, thereby causing it to risk undermining the rails-to-trails agreement.  This would create a Hobson's choice for the railroad that must apply for regulatory abandonment under federal law as the necessary first step to obtaining a CITU, while that application itself would constitute evidence of an intent to abandon in terms of state law (thereby undermining the CITU effort by making it more costly).  Such a holding would completely frustrate state and federal policies intended to promote the preservation of rail corridors and their conversion to trail use.

*Chevy Chase Land Co. v. United States*, 733 A.2d 1055, 1090-91 (Md. 1999).

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 2
(14-cv-00784-JCC)

STB noted that if the parties successfully negotiated an agreement, no further STB action was necessary, although the "[u]se of the right-of-way for trail purposes [was] subject to restoration for railroad purposes." *Id.*  Alternatively, the STB noted that if "no agreement is reached . . . BNSF may fully abandon the line." *Id.* at 3.  The parties successfully negotiated an agreement that provided for interim trail use, while at the same time allowing for the transfer of BNSF's interests in the corridor to the Port.  Thomsen Decl. Ex. 8 (Dkt. 77-9).  As a result, the condition for abandonment never occurred.

**Disposition of the Corridor.**  In December 2009, the Port paid BNSF $81 million for the northern portion of the corridor and BNSF donated the balance to the Port.  True Decl. Ex. M, N (Dkt. 69-13, 69-14).  These were "a single, interdependent transaction." *Lane v. Port of Seattle*, 178 Wn. App. 110, 115, 316 P.3d 1070 (2013).  BNSF warranted that it was conveying rights "sufficient to permit railroad operations on the Property, including passenger railroad operations." True Decl. Ex. M at 7 § 4.4 (Dkt. 69-13) and Ex. N at 8 § 4.4 (Dkt. 69-14).

As contemplated at the time of purchase, the Port sold certain rights and portions of the corridor to other entities including Sound Transit, Puget Sound Energy, and King County. Thomsen Decl. Exs. 11-15 (Dkt. 77-12 to 77-16).  In the railbanked sections of the corridor, the primary goals have been to develop a regional trail, provide public transportation, allow for appropriate utility services, and preserve the corridor for possible future rail service.  True Decl. at ¶ 10 (Dkt. 69).  King County serves as the trail sponsor for the southern portion of the corridor. True Decl. at ¶ 3 (Dkt. 69).  The regional partners expended substantial sums to acquire BNSF's state law fee and railroad easement property rights in reliance on the provisions of the Trails Act that preserve state law railroad easements and prevent those easements from reverting to the underlying landowners.  True Decl. at ¶¶ 11, 13 (Dkt. 69).

**The *Haggart* Case.**  In February 2009, a group of plaintiffs, including virtually all of

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 3
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

the plaintiffs in this case,[5] sued the United States in the Court of Federal Claims for a "taking" because the STB issued a NITU for the corridor.  *Haggart v. United States*, No. 09-103L (Fed. Cl.).  Defendants were not parties to that lawsuit.[6]  The *Haggart* court held that the STB's issuance of the NITU for the corridor was a taking that required the United States to compensate plaintiffs for their property.  108 Fed. Cl. 70 (2012).  The court held that the government owed the plaintiffs the difference between the value of their land unencumbered by the railroad easement (what they would have had if the Trails Act had not prevented abandonment under state law) and the value of their land encumbered by a "general easement permitting recreational trail use with the potential for future railway use by way of rail-banking or possible future development of a commuter rail line."  *Id.* at 96.

The United States and the plaintiffs later entered into a settlement agreement approved by the court.  *Haggart v. United States*, 116 Fed. Cl. 131 (2014).  Under that settlement agreement, plaintiffs in *Haggart* will collectively receive $137,961,218.69, equating to an average of $545,000 per plaintiff.  *Id.*[7]

### III.  STATEMENT OF ISSUE

Did railbanking under to the Trails Act preserve the railroad easements in the corridor and allow for interim use of the corridor as a trail?

### IV.  ARGUMENT

**A.    Summary Judgment Is Appropriate Because the Issue Is Resolvable as a Matter of Law.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[5] Defendants understand that only ten plaintiffs in this case own properties not involved in *Haggart*.

[6] Defendants continue to disagree with certain conclusions of the *Haggart* decision, and intend to demonstrate at a future time that King County holds a fee interest, rather than an easement, to certain properties in the corridor. *See* Order re Plfs.' Mot. for Decl. J. at 8 (Dkt. 91).

[7] Plaintiffs refused to produce in response to discovery the final appraisals used to value the takings in *Haggart* to allow an evaluation of what "taking" they were compensated for in *Haggart*.  Thomsen Decl. Ex. 17(Dkt. 77).

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 4
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

R. Civ. P. 56(a).  To avoid summary judgment, the nonmoving party must present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A "genuine" dispute of fact constitutes evidence with which "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*

The issue presented in this motion is resolvable as a matter of law.  As noted above, this motion does not ask the Court to determine the scope of the property interests obtained from BNSF.  Instead, this motion requests a ruling about the legal effect of railbanking pursuant to the Trails Act, specifically that the Trails Act preserves railroad easements when a corridor is railbanked.  There are no facts in dispute as to that issue.

**B.      The Trails Act Preserves Railroad Easements While Also Allowing for Interim Use as a Trail.**

The Trails Act expressly preserves railroad easements in railbanked corridors.  This conclusion is supported by (1) the plain language of the Trails Act; (2) legislative history, cases, and STB decisions discussing the purpose of the Trails Act; (3) STB decisions analyzing uses of railbanked corridors including the Eastside Rail Corridor; and (4) court decisions addressing the status and use of railbanked corridors.

**1.      The plain language of the Trails Act preserves railroad easements.**

The Trails Act expressly preserves railroad easements by preempting abandonment of those easements under state law.  The Trails Act provides that interim trail use shall not result in the abandonment of railroad easements:

> [I]n furtherance of the national policy <u>to preserve established railroad rights-of-way</u> for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 5
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such <u>interim use shall not be treated</u>, for purposes of any law or rule of law, <u>as an abandonment of the use of such rights-of-way for railroad purposes</u>.

16 U.S.C. § 1247(d) (emphasis added).  The statute's authorization to use the right-of-way for interim trail use does not diminish the existing railroad property rights; instead such interim use under the Trails Act prevents the abandonment of those easements rights.  Thus, while the statute allows for trail use in the railroad right-of-way—what some courts have imprecisely called a "trail easement"—it also preserves the existing railroad easement property rights.

Basic property law requires this outcome; when an easement is not abandoned, it remains in effect.  Under Washington law, the property rights embodied in a railroad easement are vested with the easement holder, but rights terminated through abandonment automatically revert to the underlying property owner.  *Lawson v. State*, 107 Wn.2d 444, 450, 452, 730 P.2d 1308 (1986).  The rights are thus held either by the easement holder, or upon abandonment, by the underlying landowners with reversionary interests.  17 William B. Stoebuck, Washington Practice: Real Estate § 2.12 (2d ed. 2015) (the abandonment of an easement does not result in the easement becoming unowned, but rather it is released to the owner of the servient tenement).  As a result, absent abandonment, the railroad easement rights do not revert to the owner of the underlying fee, but instead remain in effect and are held by the easement holder.

Plaintiffs previously sought to convince this Court that the Trails Act merely stopped the "land" from reverting and preserved only the "physical characteristics" of the corridor, but not railroad easement interests.[8]  This Court disagreed and held that plaintiffs "failed to establish as a matter of law their contention that that 'the rail banking statute merely prevents the land from reverting back to landowners and preserves the physical characteristics of the

---

[8] It is not clear what plaintiffs meant by the Trails Act stopping the reversion of the "land."  Pls.' Reply at 9 (Dkt. 80).  The land itself remains and fee ownership of the land remains at all times with the fee owner.  The only reversion the Trails Act could block is the reversion of the rights embodied in the railroad easement.  The Court properly rejected plaintiffs' argument that the Trails Act prevents the reversion of the "land."

1   corridor [but not the easement itself] in case reactivation ever occurs,' at which time the

2   easement presumably springs back into existence."  Order re Pls.' Mot. for Decl. J. at n. 6 (Dkt.

3   91) (quoting Pls.' Reply at 9) (alteration in original).  Plaintiffs could not establish this

4   contention because the statute makes clear that it preserves the railroad easements.

5          Other aspects of the Trails Act emphasize that it preserves railroad easements.  First,

6   the Trails Act does not create a contingent future interest that springs back into existence upon

7   reactivation as plaintiffs argued.  Congress enacted 16 U.S.C. § 1247(d) "to preserve

8   established railroad rights-of-way for future reactivation," not for use "upon future

9   reactivation."  The preserved railroad easements are not held in abeyance to be exercised only

10  "upon" reactivation by the STB.  Those easements are preserved "for" reactivation; "for"

11  means "in order to bring about . . . with the purpose or object" while "upon" means "on the

12  condition of."  Webster's Third New Int'l Dictionary 886, 2518 (2002).

13         Had the Trails Act intended merely to create contingent future interests, such a

14  complicated regime would necessarily need to be fully explicated in the statute.  Congress did

15  not enact that regime but adopted the simple and unambiguous language that "interim use shall

16  not be treated, for purposes of any law or rule of law, as an abandonment of the use of such

17  rights-of-way for railroad purposes." 16 U.S.C. § 1247(d).  The result is that there is no

18  abandonment "for the purposes of any law," which includes state property law, and as a result

19  state law abandonment is preempted and the railroad easements are preserved.

20         Second, the Trails Act's language authorizing a railroad to convey its property rights to

21  a trail sponsor depends on the continued existence of those property rights.  The protection

22  against abandonment of a railroad easement is available when interim trail use is established

23  "pursuant to donation, transfer, lease, sale or otherwise." 16 U.S.C. § 1247(d).  The

24  rulemaking for Trails Act implementation recognized this flexibility:

25              The amendment does not prohibit alienation of rights-of-way that are proposed for
            interim trail use.  Indeed, the amendment specifically lists <u>several forms of transfer</u>

that may be used where appropriate.  Therefore, as long as the transfer agreement discloses the status of the involved property, including its being subject to Commission jurisdiction for future restoration of rail service (and as long as the transfer is consistent with applicable State property law), trail use can occur <u>whether the involved railroad transfers or retains its interest in the right-of-way</u>.

*Rail Abandonments—Use of Rights-of-Way as Trails*, 2 I.C.C.2d 591, 599, 1986 WL 68617 (Apr. 16, 1986) (emphasis added).  For example, a railroad could retain ownership of its railroad easements in a corridor, but then lease those interests to a trail sponsor.  This is only possible, however, if the underlying railroad easement is preserved.  Absent the railroad easement, there would be no property rights to grant to the trail sponsor.

The Court need look no further than the plain language of the statute to determine that railroad easements <u>survive</u> railbanking.

> **2.      Congress, Courts, and the Surface Transportation Board have all recognized that preserving railroad easements through railbanking was a primary purpose of the statute.**

The Supreme Court confirmed the statutory purpose of "preserv[ing] established railroad rights-of-way" in *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 110 S. Ct. 914, 108 L. Ed. 2d 1 (1990) (*Preseault I*), holding that the Trails Act authorized "the ICC to <u>preserve</u> for possible future railroad use rights-of-way not currently in service <u>and</u> to allow interim use of the land as <u>recreational trails</u>."  *Id.* at 6 (emphasis added).[9]  The Court carefully described the manner in which railroad rights-of-way are preserved: Many railroads operate on easements which cease to exist when the railroad abandons the easement, at which point the easement is said to "revert" to the owners of the underlying fee.  *Preseault*, 494 U.S. at 8.

By deeming interim trail use to be like a discontinuance rather than abandonment,

---

[9] The Court of Federal Claims has slightly rephrased this language, stating, "Through passage of the National Trails System Act Amendments of 1983 (the Trails Act), Congress authorized a process by which the railroad's right-of-way can be preserved for future railroad use, and during the interim period, used as a recreational trail." *Capreal, Inc. v. United States*, 99 Fed. Cl. 133, 136 (Fed. Cl. 2011); *see also Friends of the E. Lake Sammamish Trail v. City of Sammamish*, 361 F. Supp. 2d 1260, 1274 (W.D. Wash. 2005) ("The purpose of the [statute] is not to encourage the development of recreational trails . . . it is to encourage the transition of these railbeds into recreational trails, and to preserve the right-of-way for possible future railroad reactivation.").

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 8
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Congress prevented property interests from reverting under state law.[10] . . . "The key finding of this amendment is that interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes."

*Id.* at 8-9 (quoting H.R. Rep. No. 98-28, at 8-9 (1983)).

The Court also made clear that that this purpose meant railroad corridors could be preserved although there was no current freight rail use of the corridor. The plaintiff landowners claimed that railbanking was a sham given that "trail conversion is permitted only after the Commission determines that rail service will not be needed in the foreseeable future." *Preseault I*, 494 U.S. at 18. Rejecting that argument, the Court held, "That the ICC must certify that public convenience and necessity permit abandonment before granting a CITU or NITU does not indicate that the statute fails to promote its purpose of preserving rail corridors. . . . Congress apparently believed that every line is a potentially valuable national asset that merits preservation even if no future rail use for it is currently foreseeable." *Id.* at 19.

The Trails Act's legislative history—quoted by the *Preseault I* court—confirms the purpose to preserve the railroad easements while allowing for interim use as a trail:

> The key finding of this amendment is that interim use of a railroad right-of-way for trail use, <u>when the route itself remains intact for future railroad purposes</u>, shall not constitute an abandonment of such rights-of-way for railroad purposes.
> . . .
> This provision <u>will protect railroad interests by providing that the right-of-way can be maintained for future railroad use</u> even though service is discontinued and tracks removed, and by protecting the railroad interests from any liability or responsibility in the interim period.

H.R. Rep. No. 98-28, at 8-9 (1983); *see also Jenkins v. United States*, 102 Fed. Cl. 598, 614 (2011) (citing statute's history in noting the statutory purpose of "facilitate[ing] the preservation of rail corridors"). An oft-cited treatise summarized the legislation:

> In 1983, Congress amended the National Trails System Act (Trails Act) to <u>solve the problem caused by state property law that allowed railroad easements to lapse upon</u>

---

[10] Discontinuance under the federal law that regulates railroad operations "allows a railroad to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future." *Id.* at 6 n.3. In this way, a discontinuance preserves state law easements to facilitate reactivation.

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 9
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

abandonment of rail service. <u>To avoid having easements lapse</u>, the amendment directs several federal agencies to encourage state or local agencies or private organizations to develop inactive rail corridors for recreational use, subject to future restoration of rail services.

Lewis Simes & Hon. John Borron Jr., *Simes and Smith The Law of Future Interests* § 290 (3rd ed. 2002) (emphasis added).[11]

  The STB, the only entity with the power to authorize the abandonment of rail lines and permit trail use on railroad rights of way, commented on what *Preseault I* and the House Report quoted above called the "key finding" (that interim use shall not constitute an abandonment of rights-of-way for railroad purposes):

This language demonstrates that the main purpose of the amendment is to <u>remove reversion</u> as an obstacle that hinders or prevents the successful conversion of entire linear rights-of-way to recreational use when the rights-of-way <u>have been operated under easements for railroad purposes</u>. Thus, Congress intends <u>that trail use occur and rights-of-way remain intact</u> when they otherwise would be subject to reversionary interests.

*Rail Abandonments-Use of Rights-of-Way As Trails (49 CFR Parts 1105 & 1152)*, 2 I.C.C.2d 591, 597, 1986 WL 68617 (Apr. 16, 1986) (emphasis added). The STB stated that trail use does not change or eliminate the rail easements: "[W]e conclude that the amendment must be construed as follows: . . . (d) Section 1247(d) preempts State laws <u>that would otherwise result in extinguishment of easements for railroad purposes</u> and reversion of rights-of-way to abutting landowners." *Id.* at 596. The STB continued:

This language, and its legislative history, express congressional intent to preempt State property law that might otherwise require a reversion of rights-of-way upon the discontinuance of rail operations . . . . Since the amendment provides that interim trail use under section 1247(d) shall not constitute abandonment of rights-of-way for railroad purposes, <u>the railroad easement continues and reversionary</u>

---

[11] Other secondary sources also have explained how the Trails Act allows trail use and preserves railroad easement interests. "The [Trails] Act is designed to prevent an interest in a railroad right-of-way from reverting under state law when the right-of-way is used as a trail after the railroad discontinues service." 65 Am. Jur. 2d Railroads § 55 (2014). "Railbanking is the preservation of an easement that has been previously used as a rail thoroughfare." *Id.* "The [Trails] Act and its implementing regulations require that a trail sponsor have the same control over the entire right-of-way corridor that would be held by a railroad in order that the trail sponsor can ensure that any and all uses made of the right-of-way are consistent with the restoration of rail service." *Id.*

interests do not mature.

*Id.* at 600 (emphasis added).

Congress, courts, and the STB all have recognized that Congress intended to preserve railroad easements that otherwise would extinguish upon non-use.

**3.      The Surface Transportation Board has repeatedly recognized that railroad easements in a railbanked corridor are preserved.**

In a ruling related to the corridor, the STB stated, "a rail banked line is not abandoned, but remains part of the national rail system, albeit temporarily unused for railroad operations." *In re King County*, STB Finance Docket No. 35148, 2009 WL 2979430, at *2 (Sept. 18, 2009); *see also Friends of the E. Lake Sammamish Trail*, 361 F. Supp. 2d at 1273-74 ("railbanked corridors remain part of the national rail transportation system").

For this corridor (as all others), the STB issued the NITU based on the trail user's agreement that "the use of the right-of-way for trail purposes is subject to future reactivation for rail service," an agreement required by 49 C.F.R. 1152.29(d)(2). *See In re BNSF Ry. Co.*, STB Docket No. AB-6 (Sub-No. 464X) 2008 WL 4718449, at *2 (Oct. 27, 2008). Upon authorization "to construct and operate a rail line over the right-of-way," the STB must vacate the NITU. 49 C.F.R. 1152.29(c)(3). The STB's ability to immediately rescind its NITU and authorize railroad reactivation requires that the NITU process—including the process followed for this particular corridor—does not "extinguish" the right to use the corridor under the original railroad easement. *See also In re Ballard Terminal R.R. Co.*, STB Finance Docket No. 35731, 2014 WL 7405859, at *4 (Dec. 30, 2014) (stating that this corridor will be reactivated for rail use upon request of a bona fide petitioner—a petitioner who has "sufficient financing and demonstrates sufficient shipper demand to warrant the proposed reactivation").

In addition to the STB rescinding a NITU, the STB requires a reactivating railroad to obtain the necessary property rights from the owner of those interests, which is often the trail sponsor. The STB is not involved in the property transfer itself, but leaves that transfer to the

1    parties.  This further emphasizes that the Trails Act preserves railroad easements because these

2    easements are property rights that must be acquired by the reactivating railroad.

3           If the reactivating railroad (or its predecessor) railbanked the corridor, the obligation of

4    the railroad to compensate a trail sponsor for the property rights necessary for service is as

5    defined in the trail use agreement.  *In re Georgia Great Southern Div., South Carolina Cent.*

6    *R.R. Co.*, STB Docket No. AB-389 (Sub-No. 1X), 2003 WL 21132515, at *5 (May 16, 2003).

7    In this case, the Trail Use Agreement specifies that if BNSF reactivates the corridor, "the

8    County agrees that it will make its interest in the corresponding portion(s) of the Railbanked

9    Segments available for such restoration and BNSF will compensate the County for such

10   interests and any improvements that have been made by the County on the Railbanked

11   Segments at their then fair market value."  True Decl. Ex. D at 2 (Dkt. 69-4).

12          Similarly, if the reactivating railroad is not the same or the successor entity to the

13   company that railbanked the corridor, it must obtain the property rights necessary to provide

14   service.  *In re R.J. Corman R.R. Co. /Pennsylvania Lines, Inc.*, STB Finance Docket No.

15   35116, 2009 WL 221010, at *6 (July 27, 2009) (the railroad may reactivate if it "acquires the

16   railbanked Eastern Segment").  Indeed, the STB in December 2014 denied the petition of a

17   third-party railroad to reactivate a segment of the corridor north of plaintiffs' properties.  The

18   STB denied the petition in part because the railroad seeking reactivation was not "in a position

19   to obtain the funding needed to . . . pay appropriate compensation to the Regional Parties[12] for

20   use of the right-of-way they own."  *In re Ballard Terminal Railroad Company, L.L.C.*, Docket

21   No. FD 35731, 2014 WL 740589, at *6 (Dec. 30, 2014).

22          The treatment of the property rights in a railbanked corridor upon reactivation

23   demonstrates that the Act and its implementation through the STB rely on a reactivating

24   railroad to independently obtain the necessary property interests to carry out reactivated rail

---

25   [12] The segment of corridor at issue in the reactivation petition is owned by King County, the City of Kirkland, and Sound Transit.  *Id.* at *1, 2.

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 12
(14-cv-00784-JCC)

service.  As explained in *Georgia Great Southern, R.J. Corman* and *Ballard Terminal Railroad,* the STB does not set compensation for, issue, or allocate state law property rights, but rather leaves it to the parties to negotiate compensation for and conveyance of those property rights.  Those property rights, including any railroad easement rights, must exist in order to be owned by one party and conveyed to a reactivating railroad.  This system could not function if railbanking extinguished the railroad easement rights.

The STB's understanding that the railbanking process preserves railroad easements is also manifest in its decisions allowing trail sponsors to utilize the railroad easement:  "If the rail carrier's interest allows different uses (such as underground cable) we see no reason why a trail operator should not be able to do the same.  The reversionary property owner's position has not changed." *Rail Abandonments—Use of Rights-of-Way As Trails—Supplemental Trails Act Procedures*, Ex Parte No. 274 (Sub-No. 13), 1989 WL 238631, at *5 n.10 (May 18, 1989); *see also Rail Abandonments-Use of Rights-of-Way As Trails,* 2 I.C.C. 2d at 608, 1986 WL 68617, at **13 ("we see no reason why the development of non-trail activities or structures on or around the right-of-way should be restricted, as long as they are consistent with interim trail use, rail banking, and future restoration of rail service").

Accordingly, the STB has "allowed dual uses of trails," including uses "of the right-of-way as both a trail and a utility corridor."  *In re Kansas Eastern R.R., Inc.*, STB Docket No. AB-563 (Sub-No. 1X), 2006 WL 1516602, at *3 (June 1, 2006); *see also In re T & P Railway*, STB Docket No. AB-381 (Sub-No. 1X), 1997 WL 68211, at *5, 7 n.16 (Feb. 20, 1997) (use of the right-of-way by Western Resources for utility transmission lines did not rescind NITU and could provide a source of funds for maintenance) *rev'd on other grounds*, *Becker v. Surface Transp. Bd.*, 132 F.3d 60 (D.C. Cir. 1997); *In re KCT Railway Corp.*, ICC Docket No. AB-335 (Sub-No. 2X), 1992 WL 311582, at *1-2 (Oct. 26, 1992) (railbanked corridor could be used for street extension); *In re Baltimore and Ohio R. Co*, ICC Docket No. AB-19 (Sub-No. 112),

1990 WL 287371, at *2 (March 2, 1990) ("transitway proposal" not shown to be "incompatible with either trail use or the restoration of service"; referencing decision allowing tourist train); *In re CSX Transp., Inc.*, STB Docket No. AB-55 (Sub-No. 514X), 1997 WL 598035, at *1 n.5 (Sept. 30, 1997) ("Nothing in the statute or our regulations precludes a right-of-way from being used for mixed highway (or light rail) and recreational use.").

The United States Government Accountability Office concurs:

> [N]othing in the rail-banking statue or the [STB's] regulations precludes a right-of-way from being developed for a mixed use, that is, combining a recreational trail with a highway or light rail line. Similarly, the Board has noted that a trail sponsor's receipt of revenues from a utility company maintaining transmission lines along the right-of-way is not, in and of itself, impermissible. The arrangement could simply be a way for the trail sponsor to obtain funds for the maintenance of the right-of-way and for liabilities and taxes and may not substantially affect the trail use or rail banking.

U.S. Gov't Accountability Office, GAO/RCED-00-4, *Surface Transportation: Issues Related to Preserving Inactive Rail Lines as Trails* at 10-11 (1999) (Hackett Decl. Ex. A) (Dkt. 71-1).

These orders and statements are unambiguous: while a corridor is railbanked, the railroad easements are preserved and may be used in the same manner as before railbanking.

### 4. Court decisions addressing the status of railbanked property rights recognize that the Trails Act preserves railroad easements.

All courts that have considered the Trails Act's effect on state law railroad easement property rights have held that the Trails Act preserves those rights, without reduction, and that a trail sponsor may own and exercise those rights. For example, the Vermont Supreme Court ruled, in a quiet title action that was a follow-up to the *Preseault*[13] cases, that the trail sponsor owned the same railroad easement rights held by the railroad and could prevent the underlying landowners from disturbing the corridor:

> The unambiguous purpose of this legislation is not only to provide recreational trails, but to preserve established railroad rights-of-way for future reactivation of rail service. To construe the State's interest in the right-of-way as less than the

---

[13] *Preseault I*; *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996).

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 14
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   <u>interest of an operating railroad creates the risk of frustrating Congress' clear intent
    and purpose</u>.

2   *State v. Preseault*, 163 Vt. 38, 652 A.2d 1001, 1003 (1994) (internal citations omitted)

3   (emphasis added); *see also Preseault v. City of Burlington*, 908 A.2d 419, 422 (Vt. 2006)

4   (citing this analysis with approval); *Wild v. Brooks*, 862 A.2d 225, 230 (Vt. 2004) (describing

5   facts of *State v. Preseault*: "the State filed a trespass action against abutters who claimed

6   interest in a railroad right-of-way owned by the State").

7           One of the more thorough treatments is in *Illig v. U.S.*, 58 Fed. Cl. 619 (2003).  In *Illig*,

8   the court rejected the plaintiffs' argument that railbanking converted the easement from an

9   exclusive railroad easement into a narrower non-exclusive trail easement.  The court held that

10  the easement "retained essentially the same characteristics as the original easement, both in its

11  location and exclusivity," *id.* at 631, and that the trail sponsor could exercise the full scope of

12  the property rights contained in the railroad easements just as the railroad had.  *Id.* at 634.

13  While the *Illig* court called this a "new" easement, the court did not conclude that the original

14  rail easement was destroyed or limited.  Rather, the *Illig* court recognized that railbanking

15  created a new burden by adding the right to use the preserved railroad easement for a trail.[14]

16  *See also Trevarton v. South Dakota*, No. 14-5031-JLV, 2015 WL 1459620, at *6 (D.S.D. Mar.

17  29, 2015) (quoting *Illig* with approval).

18          Similarly, in *Dana R. Hodges Trust v. United States*, 111 Fed. Cl. 452, 475 (2013), the

19  court held that crossing rights over railroad easements remained in force after railbanking

20  because the easement obtained by the trail sponsor kept "essentially the same characteristics"

21  of the preexisting railroad easement.

22          The Eighth Circuit also has rejected an attempt by landowners to claim a trail sponsor

23  did not own the state law easement rights of the conveying railroad.  In *Grantwood Village v.*

24  *Missouri Pac. RR Co.*, 95 F.3d 654 (8th Cir. 1996), the court confirmed that the railroad

25  ───────────────

[14] This is why the resulting property interest may be more accurately described as a railroad easement with trail use as a permissible use.

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 15
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1    properly transferred its interest in the right-of-way to the trail sponsor under Missouri law, and

2    rejected the claim that the railroad had abandoned its easement by virtue of the railbanking

3    process.  *Id.* at 658-59.

4         A similar result was reached in *Palmetto Conservation Found. v. Smith*, 642 F.

5    Supp. 2d 518 (D.S.C. 2009).  An earlier case had determined that the trail sponsor "was the

6    valid holder of Norfolk Southern's right-of-ways."  *Id.* at 522.  In affirming the right of the trail

7    sponsor to prevent an adjacent landowner who owned the underlying fee from altering any

8    portion of the corridor, the court stated that the trail sponsor "can utilize the entire 200-foot

9    right-of-way or it can gratuitously allow certain other temporary uses" just as the "railroad had

10   the right to use all 200 feet of the right-of-way" or "gratuitously allow[] certain uses."  *Id.* at

11   527.  That right allowed the trail sponsor to totally exclude the owner of the underlying fee

12   from the easement.

13        In holding that railroad easements continue to exist, these cases recognize that a

14   primary purpose of preserving such rights is to allow the trail sponsor to control and manage

15   the corridor so that it is available for rail use in case of reactivation.  The Act requires a trail

16   sponsor to "assume full responsibility for management" of a right-of-way and to accept the

17   right-of-way subject to restoration of service.  16 U.S.C. § 1247(d).  The STB rules impose this

18   duty on trail sponsors through the Statement of Willingness to Assume Financial

19   Responsibility, which includes an agreement to assume full responsibility for "[m]anaging the

20   right-of-way," and requires an acknowledgment that use of the right-of-way is "subject to

21   future reconstruction and reactivation" for rail service.  49 C.F.R. § 1152.29(a)(2) and (3).

22        In *Illig,* plaintiffs claimed that the railbanking burden should be treated as a mere "trail"

23   easement where the underlying fee owner could use the property in any way that was not

24   inconsistent with the "trail" easement.  The court rejected this view:

25             [A] trail sponsor must also make assurances that the right-of-way is kept available
             for "future reconstruction and reactivation . . . for rail service."  In order to meet

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 16
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

> these requirements, we believe the Trails Act and its implementing regulations require that a trail sponsor must have the <u>same control</u> over the entire right-of-way corridor that would be held by a railroad in order that the trail sponsor can ensure that any and all uses made of the right-of-way are consistent with the restoration of rail service.  As we discussed above, <u>such control is exclusive</u>.

*Illig*, 58 Fed.Cl. at 631 (emphasis added) (citations omitted).  In *State v. Preseault,* the Vermont Supreme Court relied on the same reasoning when it held that the trail sponsor's rights in the corridor were exclusive, explaining that "[t]he fact that defendants' excavation activities do not present a threat to the bicycle and pedestrian path is irrelevant because these activities impinge upon the original railroad easement."  652 A.2d at 1003.

These decisions confirm that railbanking preserves all of the property rights contained in the original railroad easements.

**C.     The Takings Valuations Applied by the Court in *Haggart* and Other Takings Cases  Demonstrate That the Original Railroad Easements Continue to Exist and to Burden Plaintiffs' Land.**

In *Haggart v. United States*, 108 Fed. Cl. 70 (2012), the takings case involving this rail corridor and nearly all of these plaintiffs, the Court reinforced the conclusion that the railroad easements continue to exist.  The court reasoned:  "The NITU mechanism, <u>even as it preserves the continued existence of the easement</u>, points to the government's liability for transforming the purpose of the easement beyond what the original parties to the transaction contemplated." *Haggart*, 108 Fed. Cl. at 82 (emphasis added); *see also id.* at 76 n.3 ("Rail-banking under the Trails Act <u>preserves railroad-purpose easements</u> which otherwise would terminate by operation of law, thus retaining the easements for potential later reactivation of railroad use.").

The court in *Haggart* premised its analysis of takings damages on the preservation of the railroad easement .  To value the taking, the *Haggart* court found that the condition of the property "before" the taking was the property unencumbered by any easement because railbanking blocked plaintiffs' reversionary interest.  But for the Trails Act, the discontinuance of rail use would have been an abandonment, and the railroad easement would have reverted to

1    plaintiffs.  *See Haggart*, 108 Fed. Cl. at 97-98.

2            The "after" condition of the plaintiffs' property was "uncontested": it was "property

3    burdened by a general easement permitting recreational trail use with the potential for future

4    railway use by way of rail-banking or possible future development of a commuter rail line."

5    *Id*. at 96.  The court in *Haggart* recognized that the contemplated railroad use was not

6    speculative and the railroad easement was not, as plaintiffs suggested in prior motions, a novel

7    property interest involving a future easement triggered by STB "reactivation."  *See* Pls.' Mot.

8    Decl. J. at 18 (Dkt No. 55).  The court in *Haggart* recognized, for example, the current right of

9    Sound Transit to utilize its easement to develop a commuter rail line.  The court in *Haggart*

10   understood that the railroad easement continues to exist.

11           Courts addressing takings valuations in other recent cases also have acknowledged that

12   the federal government's liability is based on Congress' protection of the railroad easement

13   against abandonment and reversion in addition to allowing trail use in the easement.  In *Jenkins*

14   *v. United States*,  102 Fed. Cl. 598 (2011), the court described the two elements of the taking:

15           the government's taking liability [arises from the] NITU which <u>blocked the ability</u>
16           <u>of the underlying fee owners to reclaim their property free of any railroad</u>
             <u>easement</u>. Where, as here, a trail use agreement has been consummated, the scope
17           or extent of the government's taking liability is not limited to railbanking only, but
             extends to <u>all of the uses</u> authorized by the NITU, <u>including</u> the recreational trail.

18   *Id.* at 619 (emphasis added).  The *Jenkins* court recognized the dual impact of a NITU issued

19   under the Trails Act: it blocks the reversion of railroad easements and allows trail use.  *See*

20   *also Rhutasel v. United States*, 105 Fed. Cl. 220, 430 (2012) (holding that the claim that "the

21   Government is <u>only</u> liable for the taking of an easement for railroad purposes is erroneous" and

22   that the government was also liable for trail use of the easement) (emphasis added).

23           These recent takings cases, in which the courts analyzed the scope of the parties'

24   property rights "after" the takings, acknowledge that takings liability results in part from the

25   continued existence of the railroad easement after issuance of the NITUs.  Each of these cases

found that the Trails Act preserved the railroad easement, entitling property owners to compensation for its continued existence.  In none of these cases did the court convert the railroad easement to some inchoate future contingent interest.[15]

Moreover, although the takings cases show how the Trails Act preserves easements through the blocking of abandonment and reversion, these cases do not adjudicate property rights.  Takings cases are not quiet title cases to determine and allocate the property rights held by the parties; the cases do not result in a determination that a trail sponsor (not a party to those cases) owns specifically defined property rights and that the underlying landowners retain specifically defined property rights.  *Cf. Palmetto*, 642 F. Supp. 2d at 531 (in deciding property rights dispute in a railbanked corridor, the court explained, "[t]his is not a takings case and the court must decide only the issues presently before it").  There is no judgment vesting rights in one party or the other.  Rather, the takings cases merely seek to place a value on the impact of the issuance of a NITU by the STB.

**D.     No Cases Hold That Railroad Easements Are Extinguished or Diminished When a Corridor Is Railbanked Under the Trails Act.**

Plaintiffs previously cited a list of takings cases for the proposition that "numerous other cases hold that the railroad easement is abandoned upon a change in use."  Pls.' Mot. Decl. J. at 20-21 (Dkt. 55).  Their argument conflicts with the plain language of the Trails Act, misstates the holdings of those cases, and ignores the federal preemption doctrine embodied in the ICC Termination Act of 1995.

---

[15] In the cases where valuation methodology is discussed, it is apparent the takings burden imposed by railbanking is essentially the full fee value of the portion of land encumbered  by the railroad easement plus, in some cases, severance damages for harm to the remainder of the property. *Moore v. United States,* 61 Fed.Cl. 73, 74 (2004) (parties treated new easement as if it took a fee interest in the property); *McCann Holdings, LTD. v. U.S.,* 111 Fed.Cl. 608, 614, 626 (2013) ("[i]n addition to the value of the property actually taken, just compensation includes severance damages" and "parties agree that the Government took 99% of the value of the land underlying the corridor").

As noted above, the plaintiffs refused to produce the appraisals used to determine the taking in *Haggart,* which would evidence whether they settled for the fee value of their encumbered property.  Nevertheless, the *Haggart* decision stated damages would be based on the difference between the unencumbered property and the property encumbered by a general easement which the court stated included trail and rail use.  *Haggart,* 108 Fed. Cl. at 95.

---

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 19
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700     FAX, (206) 623-8717

All of the takings cases plaintiffs previously cited to this Court hold that, under state law, a change in use to a recreational trail <u>would have</u> extinguished the railroad easement and vested the reversionary interest in the owner of the underlying fee <u>but for</u> the operation of the Trails Act that blocked the reversion.  As this Court recognized, these decisions do not address or attempt to define the railroad easement rights that are preserved for future rail use.  Rather, in every cited case the court analyzed only whether a taking occurred or the proper method of valuing damages.  This Court appreciated this distinction:  "For instance, Plaintiffs' leading case, *Macy Elevator*, 105 Fed. Cl. 195, does not sufficiently address the precise nature of the remaining burdens on the railbanked land, as *Macy Elevator* pertained to takings and compensation valuation issues."  Order re Pls.' Mot. for Decl. J. at 15 (Dkt. 91).

The cases relied on by plaintiffs support the conclusion that a taking occurred <u>because</u> the original railroad easements still exist and clear title did not revert to plaintiffs as it would have under state law.[16]  These cases hold that the NITU "blocked" or "prevented" reversion of unencumbered land to the underlying fee owners, resulting in a taking valued at the difference between the value of the unencumbered property and its encumbered value.[17]  None of these cases held that the original railroad easement no longer existed.

Other Court of Federal Claims cases explicitly recognize that the railroad easement endures when abandonment and reversion is blocked.  *Geneva Rock Prods., Inc. v. United States*, 107 Fed. Cl. 166, 168 n.3 (2012) ("Rail-banking under the Trails Act preserves

---

[16] During their takings case, plaintiffs in the present case acknowledged this same effect:

> A taking occurs because the NITU blocks the landowners' interest under federal law. . . .  [T]he Trail Act prevents the operation of state laws that would otherwise come into effect upon abandonment, specifically, property laws that would "result in extinguishment of easements for railroad purposes and reversion of rights-of-way to abutting landowners."

Thomsen Decl. Ex. 19 at 2 n.1, 7 (Dkt. 77).

[17] The Port previously explained why none of the cases held that the original railroad easement no longer existed.  *See* Port of Seattle's Opp'n at 16-18 & n.12 (Dkt. 72) (providing explanation of cases); *see also* Order re Pls.' Mot. for Decl. J. at 15 (Dkt. 91) ("The Port of Seattle presents ample support for their contention that "[n]one of these cases held that the original railroad easement no longer existed.").

railroad-purpose easements which otherwise would terminate by operation of law, thus

retaining the easements for potential later reactivation of railroad use."); *Haggart*, 108 Fed. Cl.

at 76 n.3 (same); *Biery v. United States*, 99 Fed. Cl. 565, 580 (2011) ("The court finds that the

issuance of the NITUs prevented the expiration of the railroad easements that would have

otherwise been abandoned and thus the issuance of the NITUs resulted in a taking of the

plaintiffs' reversionary interests."); *Barclay v. United States*, 443 F.3d 1368, 1374 (Fed. Cir.

2006) (after NITU's issuance "the easement continued in existence beyond the time when it

otherwise would have been abandoned").

In addition, the ICC Termination Act of 1995[18] precludes abandonment of a railroad

easement without an STB order authorizing the railroad to abandon the railroad right-of-way.[19]

In September 2008, BNSF filed a notice to begin the process to abandon the corridor at issue.

Before the abandonment became effective, the STB issued a Decision and Notice of Interim

Trail Use ("NITU") authorizing the parties to negotiate a trail use agreement, subject to

possible future reactivation of the right-of-way for rail service.[20]   The NITU and trail use

agreement indefinitely stayed the STB regulatory abandonment proceedings, which would

have resumed if a trail use agreement had not been reached within 180 days after the NITU

was issued.  49 C.F.R. § 1152.29(d) (2012); *see also Barclay*, 443 F.3d at 1371 ("As the

Supreme Court explained in *Preseault I*, the purpose of the Trails Act was to preserve unused

railroad rights-of-way by converting them into recreational trails.  The mechanism is a STB

order (a NITU) staying railroad abandonment during the pendency of trail use.").  Because the

---

[18] 49 USC § 10903(a)(1) provides, "A rail carrier providing transportation subject to the jurisdiction of the Board under this part who intends to— (A) abandon any part of its railroad lines . . . must file an application relating thereto with the Board.  An abandonment or discontinuance may be carried out only as authorized under this chapter."

[19] *Nat'l Wildlife Fed'n v. ICC*, 850 F.2d 694, 704 (D.C. Cir.1988) (the STB must issue a valid certificate of abandonment before state law may cause railroad right-of-way easements to be extinguished or transferred); *Nat'l Assoc. of Reversionary Property Owners v. Surface Trans. Bd.*, 158 F.3d 135, 137 (D.C. Cir 1998) (a railroad cannot abandon or discontinue use of a railroad corridor without the STB's approval; upon abandonment approval federal regulatory jurisdiction ends and state property law controls the disposition of the property rights).

[20] *See In re BNSF Ry. Co.*, STB Docket No. AB-6 (Sub. No. 465X), 2014 WL 7405859, at *2 (Dec. 30, 2014).

---

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 21
(14-cv-00784-JCC)

1   abandonment proceedings are stayed, and because the STB has not authorized the corridor to

2   be abandoned, the easements continue to burden the land.

3         This is made clear in another Trails Act takings case, *City of Ford v. United States*, 106

4   Fed. Cl. 136 (2012).  In *City of Ford*, the government argued the railroad easement was in fact

5   abandoned prior to railbanking, and thus "the NITU could not have acted to delay Plaintiffs

6   from acquiring an unencumbered interest, because Plaintiffs had already acquired that interest

7   as a matter of Kansas law before the NITU was issued."  *Id*. at 140.  The court's analysis and

8   rejection of that argument (and similarly the rejection of the argument that state law controls

9   when an abandonment of a railroad easement occurs) is unambiguous:

> Contrary to the Government's position, it is immaterial whether BHWR abandoned
> the right-of-way for purposes of Kansas law.  As the Federal Circuit explained in
> *Barclay* [*v. United States*, 443 F.3d 1368 (Fed. Cir. 2006)], while state law
> generally creates property interests, the STB has "exclusive and plenary
> jurisdiction" to regulate railroad abandonments and the disposition of reversionary
> interests.  443 F.3d at 1374 (quoting *Preseault v. Interstate Commerce Comm'n*,
> 494 U.S. 1, 8, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990)).  Accordingly, federal, not
> state, law controls when abandonment occurs.  *See id*. ("Abandonment cannot occur
> until authorized by federal law."); *Nat'l Wildlife Fed'n v. Interstate Commerce
> Comm'n*, 850 F.2d 694, 704 (D.C.Cir.1988) ("Nor may state law cause a reverter of
> a right-of-way prior to an [STB]-approved abandonment.").

16   *Id*. (emphasis added).  Because the STB has not authorized (and BNSF has not consummated)

17   an abandonment pursuant to the ICC Termination Act, the easements still exist and burden

18   plaintiffs' land.

19   **E.      The Fact That Under Washington Law the Easement Would Have Been**
20           **Extinguished but for the Trails Act Demonstrates How the Trails Act Preserves**
         **Railroad Easements.**

21         Plaintiffs' prior reliance on the Washington decisions of *Lawson v. State*, 107 Wn.2d

22   444, 730 P.2d 1308 (1986), and *King County v. Squire Investment Co.*, 59 Wn. App. 888, 801

23   P.2d 1022 (1990), to support their extinguishment theory failed because neither addressed the

24   particular issue presented by this motion, as this Court recognized.  *See* Order re Pls.' Mot.

25   Decl. J. at 16 (Dkt. 91).  Both decisions hold that cessation of railroad operations and

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 22
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1    commencement of trail use constituted abandonment of the railroad easement under

2    Washington law.  This basic tenet of Washington property law operated because there was no

3    railbanking statute in these cases to block abandonment.

4          Washington law simply does not address the issue here, which is what property

5    interests exist <u>after</u> operation of the Trails Act.  In *Lawson*, the Trails Act was not at issue.  The

6    <u>state</u> statute involved in *Lawson* did not attempt to preserve the railroad easement but merely

7    allowed conversion of a railroad right-of-way into a trail.  *Lawson,* 107 Wn.2d at 452-53

8    (citing RCW 64.04.180 and .190).  Thus, the Court in *Lawson* held that a change of use from

9    rail to trail resulted in abandonment of the corridor.[21]  *Lawson* was silent on the federal

10   question of whether railbanking under the Trails Act extinguished the original railroad

11   easement.  Likewise, *Squire Investment Co.* did not involve the Trails Act.  There, the ICC (the

12   STB's predecessor) had issued a certificate of abandonment prior to trail use.  *Squire Inv. Co.*,

13   59 Wn. App. at 891.  As with *Lawson,* the decision did not address the property interests

14   remaining after railbanking under the Trails Act because <u>railbanking had not occurred</u>.

15         Significantly, in *Good v. Skagit County*, 104 Wn. App. 670, 17 P.3d 1216 (2001), the

16   court distinguished *Lawson*.[22]  There, property owners sued Skagit County and, relying on

17   *Lawson,* claimed that that the railroad operator had abandoned the rail corridor, providing the

18   property owners "full possessory rights to the land."  104 Wn. App. at 673-74.  The Court of

---

[21] The Federal Circuit commented that *Lawson* was "on all fours" with *Preseault II* with regard to the question of whether under state law trail use is within the scope of a railroad easement.  *Preseault v. United States*, 100 F.3d 1525, 1541, 1543 (Fed. Cir. 1996) (In "scope of the Railroad's Easement" section, court concluded, "Most state courts that have been faced with the question of whether conversion to a nature trail falls within the scope of an original railroad easement have held that it does not.  *Lawson* is an example of a case practically on all fours with the case before us.") (citation omitted).  *Lawson* was not cited for the proposition that the Trails Act extinguishes a railroad easement, but rather for the proposition that under state law a change in use from rails to trails would result in an abandonment.  This is irrelevant to the question of the status of railroad easements after railbanking because the Trails Act preempts abandonment.

[22] In *Longnecker Property v. United States*, 105 Fed. Cl. 393 (2012), a federal claims court case applying Washington law and cited approvingly in *Haggart*, the Court reasoned: "section 8(d) of the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment—property laws that would result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners."  *Id.* at 405 (citations omitted).

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 23
(14-cv-00784-JCC)

Appeals rejected the applicability of *Lawson* for reasons that apply equally to this case:

> *Lawson* did not involve an alleged taking under Section 1247(d) of the Trails Act. The local trail manager, King County, acquired use of an <u>abandoned</u> corridor under 49 U.S.C. § 10906 and 49 C.F.R. § 1152.28 . . . . *Lawson* has no application here. The Court did not discuss Section 1247(d) of the Trails Act.  In this case, Skagit County acquired the disputed property under the Trails Act. . . . By deeming interim trail use to be a discontinuance rather than abandonment, Congress effectively prevented property interest from reverting under state law.  During the interim trail use, the STB retains jurisdiction over the line.  So long as the STB retains jurisdiction, state law, including that governing creation and <u>extinguishment</u> of easements, is preempted.

*Good*, 104 Wn. App. at 676 (emphasis added) (citations omitted).  As the reasoning in *Good* illustrates, Washington law does not apply to the question of whether the railroad easement survives issuance of the NITU.  Abandonment under state law does not occur because of operation of the Trails Act, and the railroad easement in a railbanked corridor is preserved.

## V.  CONCLUSION

The effect of the Trails Act is plain:  when railroad corridors are railbanked pursuant to the Trails Act, the railroad easements are preserved and trail use becomes a new interim authorized use.  The court in *Haggart* appreciated that fact, and approved the award to plaintiffs of millions of dollars for the preservation of the very railroad easements at issue in this case.  Defendants request this Court grant partial summary judgment and rule as a matter of law that railbanking of the Eastside Rail Corridor under the Trails Act preserved the railroad easements in the corridor and allowed for interim use of the corridor as a trail.

/ / /

/ / /

/ / /

/ / /

/ / /

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 24
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

1    DATED this 28th day of May, 2015.

2                                    CALFO HARRIGAN LEYH & EAKES, LLP

3                                    By: *s/ Timothy Leyh*
                                            Timothy G. Leyh, WSBA#14853
4                                    By: *s/ Randall Thomsen*
                                            Randall Thomsen, WSBA#25310
5                                    By: *s/ Kristin Ballinger*
                                            Kristin Ballinger, WSBA#28253
6

7                                    999 Third Avenue, Suite 4400
                                     Seattle, WA 98104
8                                    Telephone: (206) 623-1700 / Fax: (206) 623-8717
                                     timl@calfoharrigan.com
9                                    randallt@calfoharrigan.com
                                     kristinb@calfoharrigan.com
10

11                                   *Attorneys for Port of Seattle*

12                                   RIDDELL WILLIAMS P.S.

13                                   By: s/ Gavin W. Skok
                                            Gavin W. Skok, WSBA #29766
14

15                                   By: *s/ James E. Breitenbucher*
                                            James E. Breitenbucher, WSBA #27670
16

17                                   By: *s/ Courtney Seim*
                                            Courtney Seim, WSBA #35352
18

19                                   By: *s/ Bryan J. Case*
                                            Bryan J. Case, WSBA #41781

20                                   1001 Fourth Avenue, Suite 4500
                                     Seattle, Washington 98154-1192
21                                   Telephone: (206) 624-3600 / Fax: (206) 389-1708

22                                   *Attorneys for Puget Sound Energy, Inc.*

23   / / /

24   / / /

25

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 25
(14-cv-00784-JCC)

DANIEL T. SATTERBERG
King County Prosecuting Attorney

By: _s/ David J. Hackett_
　　　David Hackett, WSBA #21236

By: _s/ Peter G. Ramels_
　　　Peter G. Ramels, WSBA #21120

By: _s/ Andrew W. Marcuse_
　　　　Andrew W. Marcuse, WSBA #27552

Senior Deputy Prosecuting Attorneys
King County Prosecuting Attorney's Office
500 Fourth Ave., 9th Floor
Seattle, WA. 98104
Telephone: (206) 296-8820 / Fax: (206) 296-8819
david.hackett@kingcounty.gov

SOUND TRANSIT

By: _s/ Desmond L. Brown_
　　　Desmond L. Brown, WSBA # 16232

By: _s/ Loren Armstrong_
　　　Loren Armstrong, WSBA #33068

401 S. Jackson Street
Seattle, WA. 98104
Telephone: (206) 398-5212 / Fax: (206) 398-5222
loren.armstrong@soundtransit.org

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 26
(14-cv-00784-JCC)

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1

<u>**CERTIFICATE OF SERVICE**</u>

2

3

I hereby certify that on May 28, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

4

5

6

Daryl A. Deutsch
daryl@rdtlaw.com

7

8

Thomas S. Stewart
Elizabeth McCulley
stewart@bscr-law.com
mcculley@bscr-law.com

9

10

Gavin W. Skok
James E. Brietenbucher
Courtney Seim
Bryan J. Case
gskok@riddellwilliams.com
jbreitenbucher@riddellwilliams.com
cseim@riddellwilliams.com
bcase@riddellwilliams.com

11

12

13

14

15

David J. Hackett
Andrew W. Marcuse
david.hackett@kingcounty.gov
andrew.marcuse@kingcounty.gov

16

17

18

Desmond L. Brown
Loren G. Armstrong
desmond.brown@soundtransit.org
loren.armstrong@soundtransit.org

19

20

21

DATED this 28th day of May, 2015 at Seattle, Washington.

22

23

*s/ Susie Clifford*
Susie Clifford

24

25

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS'
DECLARATORY JUDGMENT CLAIM - 27
(14-cv-00784-JCC)